## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF DEMETRIUS L. STEPHENSON
BY SPECIAL ADMINISTRATOR RICHARD COAD,

    *Plaintiff,*

    *v.*

CALUMET COUNTY, MAGGIE RATAJCZAK,
DALIA DEDERING, KATRINA RUMPFF,
LORI FLEMING, KURT MAYER, KIMBERLY SENTEK,
STEVEN JOHANNES, BRIAN BREIT, KURT KOHLER,
ELIZABETH ZAHROBSKY, BRIAN POST,
BRENDA KNUPPEL, JULIE HOERNING, BRETT J. BOWE,
DANIEL VAN OSS, KYLES VANG, HEATHER ZITTLOW,
ROBERT AUSLOOS, KRISTEN KLOTZ, SHANNON TESKA,
NICOLE SMITH, KRISTI LECLAIR,
ADVANCED CORRECTIONAL HEALTHCARE, INC.,
KAREN RONQUILLO-HORTON, AMY KEPPERS,
ASHLEY PFEIFER, MARIE BRENNER, MICHELLE NOEL,
MICHELLE ROBBINS, AND ROXANNE MORRIS,

                                Case No: 1:22-cv-956

    *Defendants.*

## COMPLAINT

The Estate of Demetrius L. Stephenson, by its attorneys, Strang Bradley, LLC, for its complaint against Defendants, states:

### INTRODUCTION

1.      On May 2, 2019, Demetrius L. Stephenson ("Demetrius"), a 17-year-old was taken into custody at the Calumet County Jail. It was obvious that Demetrius was suicidal.

He was constantly crying and making explicit and specific suicidal statements, stating that he was having auditory hallucinations, and that he was hearing a voice telling him to kill himself.

2. Over the following few days Calumet County Jail correctional officers, administration and medical staff became aware that Demetrius had a history of multiple previous suicide attempts, that he had been hospitalized for at least one suicide attempt recently, that he was diagnosed as having schizophrenia and bi-polar disorder, that he was without his schizophrenia medication, that he was having visual and auditory hallucinations, that he could see a demon that talks to him and was telling him to kill himself, and that he repeatedly told correctional officers and medical staff that he was going to kill himself.

3. Other inmates in the jail could tell that Demetrius was suicidal and repeatedly contacted Calumet County Jail correctional officers asking for help. Demetrius himself repeatedly contacted Calumet County Jail correctional officers, administration and medical staff asking to see a mental health professional and when he did speak to that person, he repeatedly told them that he was going to kill himself. Demetrius was not given his psychotropic medications despite submitting a written request asking for his mental health medications.

4. Demetrius L. Stephenson, by then age 18, died early in the morning of 21 August 2019. He died at the Ascension Calumet Hospital as a result of injuries from hanging himself while being held in custody at the Calumet County Jail. This is a civil

rights action brought by Estate of Demetrius L. Stephenson for damages under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Demetrius Stephenson's rights as secured by the United States Constitution.

6.      This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and the state law claims for indemnification pursuant to 28 U.S.C. § 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b). Defendant Calumet County is a political subdivision of the state of Wisconsin located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

8.      The Plaintiff, the Estate of Demetrius L. Stephenson, is a legal entity with the capacity to sue and be sued.

9.      Richard Coad is the duly appointed Special Administrator of the Estate of Demetrius L. Stephenson.

10.      Defendant Calumet County is a political subdivision of the state of Wisconsin and is and/or was the employer of the individual correctional officer and mental health Defendants. Pursuant to Wis. Stat. § 59.01, Calumet County is authorized, inter alia, to sue and be sued. Calumet County is a "person" for purposes of 42 U.S.C. § 1983. Calumet County owns and operates the Calumet County Jail. Acting through the

Calumet County Sheriff's Office, the County is responsible for training, supervising, and disciplining jail employees and contract staff working within the jail. Calumet County is also responsible for adopting, implementing, and enforcing jail policies and practices, and ensuring that jail conditions and the medical treatment of detainees complies with the United States Constitution and other federal and state laws. Pursuant to Wis. Stat. § 59.27(1), Calumet County acting through its Sheriff in his official capacity, cannot delegate away its constitutional duties regarding medical care for detainees. The County is liable for the jail policies, practices, and customs that caused the harm alleged, infra. Under Wis. Stat. § 895.46(1)(a), the County is required to pay or indemnify all judgments, including compensatory and punitive damages, costs, disbursements, and reasonable attorney's fees that may be awarded against its officials and employees who are liable for acts within the scope of their employment.

11.     Defendant Maggie Ratajczak was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Ratajczak engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

12.     Defendant Dalia Dedering was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Dedering engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

13.     Defendant Katrina Rumpff was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Rumpff engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

14.     Defendant Lori Fleming was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Fleming engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

15.     Defendant Kurt Mayer was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Mayer engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

16.     Defendant Kimberly Sentek was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Sentek engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

17.     Defendant Steven Johannes was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the

health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Johannes engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

18.     Defendant Brian Breit was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Breit engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

19.     Defendant Elizabeth Zahrobsky was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Zahrobsky engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

20.     Defendant Brian Post was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Post engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

21.     Defendant Brenda Knuppel was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius

Stephenson. Knuppel engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

22. Defendant Daniel Van Oss was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Van Oss engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

23. Defendant Kyles Vang was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Vang engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

24. Defendant Heather Zittlow was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Zittlow engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

25. Defendant Robert Ausloos was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Ausloos engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

26.     Defendant Julie Hoerning was at the time of this occurrence employed as a correctional sergeant in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Hoerning engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

27.     Defendant Kurt Kohler was at the time of this occurrence employed as a correctional sergeant in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Kohler engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

28.     Defendant Brett J. Bowe was at the time of this occurrence employed as a jail administrator in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Bowe engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

29.     Defendant Kristen Klotz was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. Klotz was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Klotz engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

30.     Defendant Shannon Teska was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. Teska was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Teska engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

31.     Defendant Nicole Smith was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. Smith was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Smith engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

32.     Defendant Kristi LeClair was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. LeClair was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. LeClair engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

33. Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a foreign for-profit corporation incorporated under the laws of the State of Illinois, doing business in the State of Wisconsin. ACH's principal office is located at 3922 W. Baring Trace, Peoria, IL 61615, and its Registered Agent is C T Corporation System, 301 S. Bedford Street, Suite 1, Madison, WI 53703. As is relevant herein, ACH is a "person" for purposes of 42 U.S.C. § 1983. ACH's acts and omissions in relation to the Calumet County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. ACH is legally liable for all its policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Calumet County Jail or elsewhere.

34. Defendant Amy Keppers was at the time of this occurrence employed as a nurse in the Calumet County Jail. Keppers was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Keppers engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

35. Defendant Ashley Pfeifer was at the time of this occurrence employed as a nurse in the Calumet County Jail. Pfeifer was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Pfeifer engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

36.     Defendant Marie Brenner was at the time of this occurrence employed as a nurse in the Calumet County Jail. Brenner was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Brenner engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

37.     Defendant Michelle Noel was at the time of this occurrence employed as a nurse in the Calumet County Jail. Noel was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Noel engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

38.     Defendant Michelle Robbins was at the time of this occurrence employed as a nurse in the Calumet County Jail. Robbins was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Robbins engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

39.     Defendant Roxanne Morris was at the time of this occurrence employed as a nurse in the Calumet County Jail. Morris was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Morris engaged in the

conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

40. Defendant Karen Ronquillo-Horton was at the time of this occurrence employed as a doctor in the Calumet County Jail. Ronquillo-Horton was employed at the Calumet County jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Ronquillo-Horton engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH.

## FACTS

41. Demetrius L. Stephenson was booked into the Calumet County Jail on May 2, 2019, when he was 17 years old.

42. On May 3, 2019, Demetrius was severely depressed. He spent the day in jail crying, making suicidal statements, and stating that he was having auditory hallucinations. Specifically, Demetrius said that he was going to slit his wrists because he was hearing a voice telling him to do so.

43. On May 3, 2019, Calumet County Jail correctional officers informed Sergeant Julie Hoerning about Demetrius's suicidal statements.

44. On May 3, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Nicole Smith by phone. During that phone call, Demetrius told Nicole Smith that he had been diagnosed with bipolar disorder, ADHD, and an anxiety disorder; that he has a history of suicidal behavior; that he feels like he is a "disease that

needs to be put to rest"; that the "cons outweigh the pros" in his life; and that he is hearing voices telling him to slit his wrists, eat glass, or eat pills.

45.     On May 6, 2019, Roxanne Morris conducted a medical screening intake on Demetrius Stephenson. In her medical screening report she documented that Demetrius was depressed; that he was thinking of hurting or killing himself; that the last time he cut himself was a week ago; that he was previously hospitalized for attempting to commit suicide by overdosing on pills; and that he should be taking medication for schizophrenia.

46.     On May 6, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Kristen Klotz. During that conversation, Demetrius told Klotz that he had been diagnosed with anxiety disorder; that he has a history of suicidal behavior, specifically that he previously attempted to commit suicide by overdosing on medication; that two days ago he also felt like killing himself and that he was specifically thinking about hurting himself with a comb; that he is frequently paranoid that planes are going to fly over and drop bombs; that he recently opened a Dybbuk box which released a demon that is now following him; that he was having visual and auditory hallucinations in which he can see the figure of the demon, that it talks to him, and that the demon tells him to kill himself.

47.     On May 6, 2019, Klotz removed Demetrius from his suicide watch status. This decision was approved by and signed off by Karen Ronquillo-Horton.

48.     On May 14, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Klotz. Demetrius told Klotz that he did not remember meeting with her the previous week. During that conversation Demetrius was crying and depressed. Demetrius told Klotz that he has suicidal thoughts that come and go; that he might not be

here much longer; that he has panic attacks and that he suffers from schiziophrenia, bipolar disorder, and an anxiety disorder; that he was taking medication prior to coming to jail; and that he does better when he is on his medication.

49.     On or about May 29, 2019, Calumet County Health and Human Services staff member Klotz shared the above information about Demetrius's suicidal statements with fellow Calumet County Health and Human Services staff member Kristi LeClair.

50.     On May 30, 2019, Karen Ronquillo-Horton evaluated Demetrius, but there is no indication that she discussed his medication, mental health concerns, or suicidal ideation.

51.     On or about June 7, 2019, Demetrius submitted a written request to medical staff asking to see them because he only had a "two-week span of my meds before I flip shit." There is no record indicating anyone followed up with or responded to Demetrius's request.

52.     On July 1, 2019, Michelle Robbins, Marie Brenner, or Michelle Noel, completed a Medical History and Health Appraisal of Demetrius Stephenson. Although she noted that Demetrius had attempted to commit suicide one week ago while he was in jail, she did not refer him for further medical or mental health evaluations or treatment. This decision was approved by and signed off by Karen Ronquillo-Horton.

53.     On July 2, 2019, Hoerning informed Klotz that Demetrius was "very up and down."

54.     Demetrius was briefly transferred to the Winnebago County Jail from August 2, 2019 to August 5, 2019.

55.     On August 2, 2019, Calumet County Jail nurse Ashley Pfeifer sent a health transfer summary to Winnebago County Jail indicating that Demetrius had a history of prior suicide attempts and threats.

56.     On August 5, 2019, Winnebago County Jail sent a health transfer summary to Calumet County Jail indicating that Demetrius had a history of prior suicide attempts and threats. That form was acknowledged as being received by Calumet County Jail correctional officer Steven Johannes on August 5, 2019.

57.     On August 12, 2019, Calumet County Jail correctional officers informed Hoerning that Demetrius submitted a written request saying that his depression is going to be the end of him, that Demetrius was making statements to the above named Calumet County Jail correctional officers that he was going to commit suicide by hanging himself in his cell, and that he wanted to talk to a mental health professional immediately.

58.     On August 12, 2019, Hoerning informed Klotz that Calumet County Jail correctional officers were telling her that Demetrius was "borderline suicidal."

59.     On August 12, 2019, Hoerning informed Klotz and Kurt Kohler that Calumet County Jail correctional officers were telling her that Demetrius was saying that he was having a hard time because his sister was just raped and that he was asking to speak to a mental health professional.

60.     On August 13, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Shannon Teska. Demetrius told Teska "I wish I was dead"; and that he wasn't sure how he will make it more time in jail; that he was thinking of hanging himself; that he was set off because of a phone call with his mother yesterday

where he learned that his sister was hospitalized because she attempted to commit suicide; that he has previously attempted to commit suicide by overdosing on heroin; that he wants ongoing mental health care; and that he has been diagnosed with depression and bipolar disorder.

61.     On August 13, 2019, Calumet County Health and Human Services staff member Teska, emailed the information contained in the above paragraph to Brett Bowe, Kurt Kohler, Julie Hoerning, Kristen Klotz, and Kristi LeClaire.

62.     On August 15, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Klotz. Demetrius told Klotz that he had not been drinking water; that he did not eat breakfast this morning and flushed it down the toilet; that he is struggling with knowing that his sister recently attempted to commit suicide; and that he planned to kill himself after his next court date if he wasn't released from jail.

63.     On or about August 15, 2019, Calumet County Health and Human Services staff member Klotz, emailed the information contained in the above paragraph to all of the above-named correctional officers and jail administrators.

64.     On or about August 16, 2019, Demetrius's pod mates informed jail staff that Demetrius was saying, everyday, that he was going to kill himself, and they asked the correctional officers to help Demetrius.

65.     While Demetrius was housed in the Calumet County Jail, he also spoke to some of the above-named correctional officers directly via the intercom in his cell and requested to talk to a mental health professional.

Case 1:22-cv-00956-WCG   Filed 08/19/22   Page 16 of 30   Document 1

66.     On August 20, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Klotz. Demetrius told Klotz that he still planned to kill himself after his next court date if he wasn't released from jail.

67.     On or about August 20, 2019, Calumet County Health and Human Services staff member Klotz, emailed the information contained in the above paragraph to all of the above-named correctional officers and jail administrators.

68.     The following evening, on August 20, 2019, Demetrius was found hanging in his cell at the Calumet County Jail.

69.     Demetrius L. Stephenson died early in the morning of August 21, 2019. He died at the Ascension Calumet Hospital as a result of injuries from hanging himself while in custody at the Calumet County Jail.

70.     During May through August 2019, because there were so few inmates and medical staff at the Calumet County Jail, every above named Calumet County Jail medical staff member was aware that Demetrius was suicidal.

71.     During May through August 2019, because there were so few inmates and correctional officers at the Calumet County Jail, every above named Calumet County Jail correctional officer observed Demetrius during their shift and each was aware that Demetrius was suicidal.

72.     Calumet County took Demetrius into legal and physical custody, thereby establishing a special custodial and supervisory relationship toward him by Calumet County and the individually named defendants herein to provide necessary medical care. This special custodial and supervisory relationship consequently gave rise to affirmative

contractual legal duties by Calumet County and its employees, agents, and contractors to secure Demetrius's liberty interests and rights, including his physical safety; essential medical care and treatment; and his right to be free from unnecessary pain and suffering, which are substantive rights protected by the Fourth, Fourteenth and Eighth Amendments to the U.S. Constitution—rights which Calumet County violated.

73. The Calumet County Jail staff, including the Defendants, ignored Demetrius's calls for help.

74. Other than when Demetrius was booked into the Calumet County Jail on May 3, 2019, none of the Defendants placed Demetrius on suicide watch, though they all had the power to do so.

75. None of the Defendants took steps to ensure that Demetrius had access to his prescription medication that he was taking prior to being booked into the Calumet County Jail or to ensure that Demetrius received the immediate medical attention that he needed while he was in jail.

76. None of the Defendants contacted Demetrius's physician or outside healthcare provider to identify Demetrius's precise medical conditions, history of being hospitalized for attempting suicide, prescriptions, or the risk of going without his medications.

77. It was obvious to anyone and everyone who had contact with Demetrius that he was suicidal, that his life was in danger, and that he needed immediate medical attention.

78. The Jail did not employ a nurse or other medical staff on a daily basis and instead left it up to non-medical jail staff to "care" for Demetrius most days.

79. Defendants Calumet County and ACH failed to have a sufficient policy or protocol in place to protect inmates who repeatedly reported suicidal ideation.

80. Demetrius's serious medical needs were ignored because of the policies and practices of ACH and Calumet County, pursuant to which the serious medical needs of people detained at the Calumet County Jail are routinely ignored.

81. The foregoing events are the result of policies and practices instituted by the Defendants which prioritize low costs for jailers and profits for ACH, at the expense of the health and lives of people who are detained in jails serviced by ACH, including Calumet County inmates.

82. ACH is a national provider of jail medical care. Its business model is to increase the volume of its sales by underbidding the competition and implementing severe cost control measures, the necessary result is unnecessary suffering of people detained at the jail.

83. The ACH CEO, for example, has explained to potential customers that ACH keeps costs to the customers down by reducing visits to hospitals. This, the CEO explained, kept its customers happy and helped ACH increase its profits by allowing it to expand its business.

84. ACH is able to implement such a scheme because jury verdicts from cases involving medical misconduct in jails and prisons are typically a fraction of the verdicts for

comparable misconduct in the free world, meaning that ACH can more easily accommodate liability claims in its business model.

85. ACH indemnifies its jail-customers, like Calumet County, through substantial insurance coverage, and as a result ACH's customers, including Calumet County, are willing to hire companies like ACH with poor track records in providing appropriate medical care, and they have little financial incentive to address deficiencies in the care provided at the jail.

86. In addition to these financial arrangements, ACH implements its cost control measures by training its employees to provide less care to detainees and by pressuring those employees to provide less care.

87. When ACH hires a new healthcare practitioner, the practitioner must attend a training session regarding the appropriate manner in which to provide medical care to people who are detained in jail. All new hires across the country are flown to ACH headquarters for this multiple-day training.

88. At the outset of the training, ACH trains its medical staff to believe that people who are detained in a jail are different than people in the free world because, whereas people in the free world seek healthcare because they have legitimate medical needs that require attention, people in jail seek healthcare in order to be comfortable, because they are merely anxious, and for similar trivial and illegitimate reasons.

89. ACH trains its practitioners to ignore or discount the medical concerns identified by persons in jails as things a person "wants" rather than legitimate medical needs, and it emphasizes that jail is "not a health spa," such that jail staff can ignore many

medical concerns raised by the detainees housed there. Trainings of this sort are repeatedly provided alike to ACH employees and correctional staff at facilities serviced by ACH.

90.    In addition to training, ACH and its customers apply pressure on ACH employees—even nominally independent practitioners—to cut back on the quality of care provided to jail detainees if such care is likely to increase outside care or staffing costs.

91.    Mistraining its employees, pressuring them not to provide medical care they believe is clinically necessary, and delaying the provision of care and medication in hopes a detainee is transferred out are all tactics that ACH uses to control its clients' costs and increase its own profits, as set forth above.

92.    ACH is indifferent to the danger that its practices will result in substandard or even catastrophic medical care.

93.    Turning a blind eye to the inadequate and catastrophic instances of care that often result from its policies and practices allows ACH to continue providing inadequate care to the detriment of people who find themselves in detention, like Demetrius.

## COUNT 1:

### 42 U.S.C. § 1983 Claim for deprivation of due process by deliberate indifference against non-medical staff Defendants

94.    Plaintiff realleges the above paragraphs.

95.    Demetrius Stephenson, at all times relevant to this complaint, was a pretrial detainee.

96.    Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, and

Bowe were subjectively and objectively, deliberately indifferent to Demetrius's serious medical condition of being suicidal.

97.     There was a strong likelihood that Demetrius would commit suicide.

98.     Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, and Bowe knew of that strong likelihood or strongly suspected the likelihood existed.

99.     The conduct of each of the Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, and Bowe, given their knowledge or strong suspicions, were objectively unreasonable and caused Demetrius's injuries.

100.     Had Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, and Bowe not acted in a manner that was objectively unreasonable, Demetrius would not have hanged himself in his jail cell.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, and Bowe, and because they acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

**COUNT 2:**

**42 U.S.C. § 1983 Claim for deprivation of due process by deliberate indifference against medical staff Defendants**

101.    Plaintiff realleges the above paragraphs.

102.    Demetrius Stephenson, at all times relevant to this complaint, was a pretrial detainee.

103.    Defendants Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair were subjectively and objectively, deliberately indifferent to Demetrius's serious medical condition of being suicidal.

104.    There was a strong likelihood that Demetrius would commit suicide.

105.    Defendants Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair knew of that strong likelihood or strongly suspected the likelihood existed.

106.    The conduct of each of the Defendants Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair, given their knowledge or strong suspicions, were objectively unreasonable and caused Demetrius's injuries.

107.    Had Defendants Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair not acted in a manner that was objectively unreasonable, Demetrius would not have hanged himself in his jail cell.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair, and because they acted maliciously,

wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys'
fees, and such other and further relief that the Court deems just and equitable.

## COUNT 3:

### 42 U.S.C. § 1983 *Monell*[1] claim against Defendant Calumet County

108.　　Plaintiff realleges the above paragraphs.

109.　　Defendant Calumet County authorized, tolerated, ratified, permitted, or
acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*,
including detainee medical decisions made irrespective of appropriate medical judgment,
which were objectively unreasonable and exhibited substantial departure from accepted
professional judgment, practices, and/or standards, and which were also deliberately
indifferent to the safety and suffering of detainees with serious medical conditions,
including Demetrius Stephenson in violation of his rights protected by the Fourth, Eighth,
and Fourteenth Amendments to the United States Constitution. These policies, practices,
and customs were the moving force which caused the deprivation of Plaintiff's
constitutional rights.

110.　　Defendant Calumet County failed to adequately train and supervise their
employees and maintained practices or processes pursuant to which detainees like
Demetrius with serious medical needs were routinely denied medical care and access to
medical care.

---

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

111.    Defendant Calumet County's policies, customs, practices, supervision of employees, or lack thereof was a direct cause or moving force which caused the deprivation of Plaintiff's constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant Calumet County, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 4:

### 42 U.S.C. § 1983 *Monell*[2] claim against Defendant ACH

112.    Plaintiff realleges the above paragraphs.

113.    Defendant ACH authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*, including detainee medical decisions made irrespective of appropriate medical judgment, which were objectively unreasonable and exhibited substantial departure from accepted professional judgment, practices, and/or standards, and which were also deliberately indifferent to the safety and suffering of detainees with serious medical conditions, including Demetrius Stephenson in violation of his rights protected by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. These policies, practices, and customs were the moving force which caused the deprivation of Plaintiff's constitutional rights.

---

[2] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

114.     Defendant ACH failed to adequately train and supervise their employees and maintained practices or processes pursuant to which detainees like Demetrius with serious medical needs were routinely denied medical care and access to medical care.

115.     Specifically, there exist policies and widespread practices within the facilities at which ACH is contracted to provide medical care, including the Calumet County Jail, pursuant to which detainees receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which (1) healthcare staff commonly disregard reports by patients of objectively serious medical needs; (2) healthcare staff refuse to provide adequate treatment to patients complaining of serious medical conditions or in need of medications; (3) healthcare staff fail to ensure continuity of care among medical and correctional staff; (4) employees prioritize profits and maintaining a competitive edge as a low-cost vendor at the expense of constitutionally adequate care; (5) inadequate levels of health care staffing are provided, including inadequately qualified staff; and (6) healthcare staff fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

116.     Defendant ACH allowed these policies and practices to flourish because ACH, which directs the provision of healthcare services at numerous jails including the Calumet County Jail, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.

117. Defendant ACH's policies, customs, practices, supervision of employees, or lack thereof was a direct cause or moving force which caused the deprivation of Plaintiff's constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant ACH, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 5:

### 42 U.S.C. §§ 12111–213, Title II of the Americans with Disabilities Act ("ADA") claim against Calumet County

118. Plaintiff realleges the above paragraphs.

119. Plaintiff Demetrius Stephenson is a qualified person under the ADA because he had a disability.

120. Demetrius was disabled in that he suffered from anxiety, depression, bi-polar disorder, schizophrenia, and suicidal ideation.

121. Demetrius's disabilities substantially limited major life activities, including breathing, concentrating, thinking, communicating, interacting with others, and caring for himself.

122. Defendants Calumet County failed to reasonably accommodate Demetrius or discriminated against Demetrius by not placing him on suicide watch, denying him medication requests, failing to adequately monitor him, and denying him adequate mental health treatment.

123.     Calumet County's failure to reasonably accommodate Demetrius or their discrimination against Demetrius because of his disability effectively denied Demetrius's access to programs and activities in the Calumet County Jail.

124.     Calumet County's policies, procedures, and rules that prevent an inmate from reporting health or suicide concerns about another inmate disproportionally affects disabled people, especially those with mental illnesses and those who are suicidal.

WHEREFORE, pursuant to the ADA, Plaintiff demands actual or compensatory damages against Defendant Calumet County, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 6:

### 29 U.S.C. §§ 794–94e, Rehabilitation Act, claim against Calumet County

125.     Plaintiff realleges the above paragraphs.

126.     Defendants Calumet County receives federal funds.

127.     Plaintiff Demetrius Stephenson is a qualified person under the Rehabilitation Act because he had a disability.

128.     Demetrius was disabled in that he suffered from anxiety, depression, bi-polar disorder, schizophrenia, and suicidal ideation.

129.     Demetrius's disabilities substantially limited major life activities, including breathing, concentrating, thinking, communicating, interacting with others, and caring for herself.

130.     Defendants Calumet County failed to reasonably accommodate Demetrius or discriminated against Demetrius by not placing him on suicide watch, denying him

medication requests, failing to adequately monitor him, and denying his mental health treatment.

131.    Calumet County's failure to reasonably accommodate Demetrius or their discrimination against Demetrius because of his disability effectively denied Demetrius's access to programs and activities in the Calumet County Jail.

132.    Calumet County's policies, procedures, and rules that prevent an inmate from reporting health or suicide concerns about another inmate disproportionally affects disabled people, especially those with mental illnesses and those who are suicidal.

WHEREFORE, pursuant to the Rehabilitation Act, Plaintiff demands actual or compensatory damages against Defendant Calumet County, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 7:

### Indemnification claim against Calumet County

133.    Plaintiff realleges the above paragraphs.

134.    Wisconsin law, WIS. STAT. § 895.46, requires public entities to pay any tort judgement for damages for which employees are liable, for acts within the scope of their employment.

135.    At all times relevant to this action, Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, Bowe, Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair engaged in the conduct complained of while in the course of and scope of their employment with Calumet County.

WHEREFORE, Plaintiff asks this Court to find that Calumet County is liable to defend this action against Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Zittlow, Ausloos, Hoerning, Bowe, Pfeifer, Robbins, Morris, Brenner, Noel, Ronquillo-Horton, Klotz, Teska, Smith, and LeClair and to satisfy any judgment entered against them, by virtue of WIS. STAT. § 895.46.

## JURY DEMAND

85.    Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: August 19, 2022

/s/ John H. Bradley
John H. Bradley
   Wisconsin Bar No. 1053124
R. Rick Resch
   Wisconsin Bar No. 1117722
STRANG BRADLEY, LLC
613 Williamson St., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com

Attorneys for Plaintiff