UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF DEMETRIUS L. STEPHENSON
BY SPECIAL ADMINISTRATOR RICHARD COAD,

     *Plaintiff,*

     *v.*

CALUMET COUNTY, MAGGIE RATAJCZAK,
DALIA DEDERING, KATRINA RUMPFF,
LORI FLEMING, KURT MAYER, KIMBERLY SENTEK,
STEVEN JOHANNES, BRIAN BREIT, KURT KOHLER,
ELIZABETH ZAHROBSKY, BRIAN POST,
BRENDA KNUPPEL, JULIE HOERNING, BRETT J. BOWE,
DANIEL VAN OSS, KYLES VANG,
KRISTEN KLOTZ, SHANNON TESKA, KRISTI LECLAIR,
ADVANCED CORRECTIONAL HEALTHCARE, INC.,
USA MEDICAL & PSYCHOLOGICAL STAFFING, S.C.,
DR. KAREN RONQUILLO,
ASHLEY PFEIFER, AND ROXANNE MORRIS,

                               Case No: 1:22-cv-956

     *Defendants.*

---

## THIRD AMENDED COMPLAINT

---

The Estate of Demetrius L. Stephenson, by its attorneys, Strang Bradley, LLC, for its complaint against Defendants, states:

### INTRODUCTION

1.      On May 2, 2019, Demetrius L. Stephenson ("Demetrius"), a 17-year-old, was taken into custody at the Calumet County Jail. It was obvious that Demetrius was suicidal. He was constantly crying, making explicit and specific suicidal statements, stating that he

was having auditory hallucinations, and stating that he was hearing a voice telling him to kill himself.

2.     Over the following few days Calumet County Jail correctional officers, administration, and medical staff became aware that Demetrius had a history of multiple previous suicide attempts, that he had been hospitalized for at least one suicide attempt recently, that he was diagnosed as having schizophrenia and bi-polar disorder, that he was without his schizophrenia medication, that he was having visual and auditory hallucinations, that he could see a demon that talks to him and was telling him to kill himself, and that he repeatedly told correctional officers and medical staff that he was going to kill himself.

3.     Other inmates in the jail could tell that Demetrius was suicidal and repeatedly contacted Calumet County Jail correctional officers asking for help. Demetrius himself repeatedly contacted Calumet County Jail correctional officers, administration, and medical staff asking to see a mental health professional. And when he did speak to that person, he repeatedly told them that he was going to kill himself. Demetrius was not given his psychotropic medications despite submitting a written request asking for his mental health medications.

4.     Demetrius L. Stephenson, by then age 18, died early in the morning of 21 August 2019. He died at the Ascension Calumet Hospital as a result of injuries from hanging himself while being held in custody at the Calumet County Jail.

5.     This is a civil rights action brought by the Estate of Demetrius L. Stephenson for damages under 42 U.S.C. § 1983.  This lawsuit seeks to force ACH, USA Medical, and

Calumet County to pay compensatory and punitive damage in an amount that it will cause the County to make the changes necessary to provide constitutionally adequate healthcare to the people they lock up in their jail and prevent something like this from happening again.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Demetrius Stephenson's rights as secured by the United States Constitution.

7.      This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and the state law claims for indemnification pursuant to 28 U.S.C. § 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b). Defendant Calumet County is a political subdivision of the state of Wisconsin located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

9.      The Plaintiff, the Estate of Demetrius L. Stephenson, is a legal entity with the capacity to sue and be sued.

10.     Richard Coad is the duly appointed Special Administrator of the Estate of Demetrius L. Stephenson.

11.     Defendant Calumet County is a political subdivision of the state of Wisconsin and is or was the employer of the individual correctional officers and mental health Defendants. Pursuant to Wis. Stat. § 59.01, Calumet County is authorized, inter alia,

to sue and be sued. Calumet County is a "person" for purposes of 42 U.S.C. § 1983. Calumet County owns and operates the Calumet County Jail. Acting through the Calumet County Sheriff's Office, the County is responsible for training, supervising, and disciplining jail employees and contract staff working within the jail. Calumet County is also responsible for adopting, implementing, and enforcing jail policies and practices and ensuring that jail conditions and the medical treatment of detainees comply with the United States Constitution and other federal and state laws. Pursuant to Wis. Stat. § 59.27(1), Calumet County acting through its Sheriff in his official capacity, cannot delegate away its constitutional duties regarding medical care for detainees. The County is liable for the jail policies, practices, and customs that caused the harm alleged, infra. Under Wis. Stat. § 895.46(1)(a), the County is required to pay or indemnify all judgments, including compensatory and punitive damages, costs, disbursements, and reasonable attorney's fees that may be awarded against its officials and employees who are liable for acts within the scope of their employment.

12.    Defendant Maggie Ratajczak was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Ratajczak engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

13.    Defendant Dalia Dedering was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius

Stephenson. Dedering engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

14.     Defendant Katrina Rumpff was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Rumpff engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

15.     Defendant Lori Fleming was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Fleming engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

16.     Defendant Kurt Mayer was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Mayer engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

17.     Defendant Kimberly Sentek was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Sentek engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

18.     Defendant Steven Johannes was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Johannes engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

19.     Defendant Brian Breit was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Breit engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

20.     Defendant Elizabeth Zahrobsky was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Zahrobsky engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

21.     Defendant Brian Post was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Post engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

22.     Defendant Brenda Knuppel was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, she was responsible for the

health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Knuppel engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

23. Defendant Daniel Van Oss was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Van Oss engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

24. Defendant Kyles Vang was at the time of this occurrence employed as a correctional officer in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Vang engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

25. Defendant Julie Hoerning was at the time of this occurrence employed as a correctional sergeant in the Calumet County Jail. In that role, she was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Hoerning engaged in the conduct complained of while she was on duty and in the course and scope of her employment with Calumet County.

26. Defendant Kurt Kohler was at the time of this occurrence employed as a correctional sergeant in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius

Stephenson. Kohler engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

27. Defendant Brett J. Bowe was at the time of this occurrence employed as a jail administrator in the Calumet County Jail. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Demetrius Stephenson. Bowe engaged in the conduct complained of while he was on duty and in the course and scope of his employment with Calumet County.

28. Defendant Kristen Klotz was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. Klotz was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Klotz engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

29. Defendant Shannon Teska was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. Teska was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Teska engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

30.     Defendant Kristi LeClair was at the time of this occurrence employed as a mental health provider in the Calumet County Jail. LeClair was employed at the Calumet County Jail through Calumet County Health and Human Services. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. LeClair engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Calumet County Jail through Calumet County Health and Human Services.

31.     Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a foreign for-profit corporation incorporated under the laws of the State of Illinois, doing business in the State of Wisconsin. ACH's principal office is located at 3922 W. Baring Trace, Peoria, IL 61615, and its Registered Agent is C T Corporation System, 301 S. Bedford Street, Suite 1, Madison, WI 53703. As is relevant herein, ACH is a "person" for purposes of 42 U.S.C. § 1983. ACH's acts and omissions in relation to the Calumet County Jail, including the acts and omissions of its employees and agents, were conducted under the color of state law. ACH is legally liable for all of its policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Calumet County Jail or elsewhere.

32.     Defendant USA Medical & Psychological Staffing, S.C. ("USA Medical") is a foreign for-profit corporation incorporated under the laws of the State of Illinois, doing business in the State of Wisconsin. USA Medical's principal office is located at 720 Cool Springs Blvd., Suite 100, Franklin, TN 37067, and its Registered Agent is C T Corporation System, 301 S. Bedford Street, Suite 1, Madison, WI 53703. As is relevant herein, USA

Medical is a "person" for purposes of 42 U.S.C. § 1983. USA Medical's acts and omissions in relation to the Calumet County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. USA Medical is legally liable for all its policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Calumet County Jail or elsewhere.

33.     Defendant Ashley Pfeifer was at the time of this occurrence employed as a nurse in the Calumet County Jail. Pfeifer was employed at the Calumet County jail as a contractor through ACH or USA Medical. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Pfeifer engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH or USA Medical.

34.     Defendant Roxanne Morris was at the time of this occurrence employed as a nurse in the Calumet County Jail. Morris was employed at the Calumet County jail as a contractor through ACH or USA Medical. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson. Morris engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH or USA Medical.

35.     Defendant Karen Ronquillo was at the time of this occurrence employed as a doctor in the Calumet County Jail. Ronquillo was employed at the Calumet County jail as a contractor through ACH or USA Medical. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Demetrius Stephenson.

Ronquillo engaged in the conduct complained of while she was on duty and the course and scope of her employment at the Calumet County Jail through ACH or USA Medical.

**FACTS**

36.     Demetrius L. Stephenson was booked into the Calumet County Jail on May 2, 2019, when he was 17 years old.

37.     When Demetrius was booked into the jail on May 2, 2019, Defendant Dalia Dedering completed a medical screening in which she asked Demetrius:

      a.  if he was depressed, to which he responded "yes";

      b.  if he was thinking of hurting or killing himself to which he responded "it goes thru his head a lot but mainly self cuts, last time self cut was a week ago";

      c.  whether he has ever attempted or been hospitalized for a suicide attempt or feelings, to which he responded "tried to overdose months ago but doesn't remember anything else other than waking up in the hospital";

      d.  whether he should be taking medication for a mental condition that he is not taking, to which he responded "meds for skitzophrenia ."

(All errors in original.)

38.     Defendant Advanced Correctional Healthcare (ACH) nurse Roxanne Morris reviewed the above answers to the booking medical screening questions for Demetrius and signed off on the form, but she did nothing to follow up on, treat, or address the reported depression, previous suicide attempt, current thoughts of suicide and self-harm, or need for medication to treat his Schizophrenia.

39.     Calumet County contracted with ACH, a for-profit jail healthcare contractor, to provide healthcare within the Calumet County Jail.

40.     The contract between ACH and the Calumet County Jail only provides for a nurse to be present in the jail two out of seven days per week and for a doctor to visit the jail once every other week.

41.     The Calumet County Jail correctional officers, who have little or no medical training, were left as the primary caretakers to address the medical concerns of inmates for the remaining five days per week.

42.     On May 3, 2019, Demetrius was severely depressed. He spent the day in jail crying, making suicidal statements, and stating that he was having auditory hallucinations and that the voices were telling him to slit his wrists.

43.     On May 3, 2019, Demetrius pressed the emergency button to speak to dispatch and told them he was having suicidal thoughts. At approximately 8:15 p.m., dispatch communicated to Calumet County Jail staff members Brett Bowe, Kurt Mayer, Dalia Dedering, Julie Hoerning, and Kurt Kohler that the inmate in C3 "was asking for help with suicidal thoughts."

44.     On May 3, 2019, Julie Hoerning told Calumet County Health and Human Services that Demetrius "is threatening to slit his wrists and that the voice telling him to do it. He is crying and saying he wishes to go to sleep and not wake up."

45.     On May 3, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Nicole Smith by phone. During that phone call, Demetrius told Nicole Smith that he had been diagnosed with bipolar disorder, ADHD, and an anxiety

disorder; that he has a history of suicidal behavior; that he feels like he is a "disease that needs to be put to rest"; that the "cons outweigh the pros" in his life; and that he is hearing voices telling him to slit his wrists, eat glass, or eat pills.

46.     On May 3, 2029, Demetrius was placed on suicide watch by Sergeant Julie Hoerning and placed into a suicide smock by correctional officer Kurt Mayer. Hoerning filled out the suicide watch paperwork stating that Demetrius told her that "the voices were telling him to cut his wrists and he wants to. He said he wants to go to sleep and never wake up." This document was reviewed and signed by Kurt Kohler on May 6, 2019, and by Dr. Ronquillo on May 7, 2019.

47.     From May 3, 2019, to May 6, 2019, Demetrius remained on suicide watch and was directly observed every 15 minutes by the following correctional officers: Dan Van Oss, Brian Post, Katrina Rumpff, Steve Johannes, Maggie Ratajczak, Kyles Vang, Brenda Knuppel, Dalia Dedering, Lori Fleming, Brian Breit, and Kurt Mayer.

48.     On May 6, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Kristen Klotz. During that conversation, Demetrius told Klotz that he had been diagnosed with anxiety disorder; that he has a history of suicidal behavior, specifically that he previously attempted to commit suicide by overdosing on medication; that two days ago he also felt like killing himself; that he was specifically thinking about hurting himself with a comb; that he is frequently paranoid that planes are going to fly over and drop bombs; that he recently opened a dybbuk[1] box which released a demon that was

---

[1] A "dybbuk" is a "malicious possessing spirit, believed to be the dislocated soul of a dead person" in Judaic mythology. Wiktionary, *dybbuk* en.wiktionary.org/wiki/dybbuk (last accessed May 22, 2023).

now following him; that he was having visual and auditory hallucinations in which he saw the figure of the demon; that the demon talks to him; that the demon tells him to kill himself; that he wants to cut his wrists; and that he wants to go to sleep and never wake up.

49.     After Demetrius told her these things, Klotz removed him from suicide watch status. Her decision was approved by and signed off by Kurt Kohler and Dr. Karen Ronquillo.

50.     On May 6, 2019, Klotz emailed a copy of her above assessment of Demetrius and notes to Kohler, LeClair, and Teska.

51.     But Klotz, Kohler, LeClair, Teska, and Ronquillo never did anything to follow up on, treat, or address the reported depression, previous suicide attempt, paranoia, or need for Schizophrenia medication. Nor did any of them diagnose or treat Demetrius's visual and auditory hallucinations, address his current thoughts of suicide, or address his specific thoughts of hurting himself with a comb or slitting his wrists.

52.     On May 14, 2019, Demetrius again spoke with Calumet County Health and Human Services staff member Klotz. Demetrius told Klotz that he did not remember meeting with her the previous week. During that conversation, Demetrius was crying and depressed. Demetrius told Klotz that he has suicidal thoughts that come and go; that he might not be here much longer; that he has panic attacks; that he suffers from schizophrenia, bipolar disorder, and an anxiety disorder; that he was taking medication prior to coming to jail; and that he does better when he is on his medication.

53.     Despite the above information, Klotz did nothing to follow up on, treat, or address the reported depression, previous suicide attempt, paranoia, or need for Schizophrenia medication. Nor did she diagnose or treat his visual and auditory hallucinations, address his current thoughts of suicide, or address his specific thoughts of hurting himself with a comb or slitting his wrists.

54.     Demetrius then spent the next 16 days in the Calumet County Jail without any mental health treatment, including counseling or medication.

55.     On or about May 29, 2019, Calumet County Health and Human Services staff member Klotz shared the information from her previous meetings with Demetrius about Demetrius's suicidal statements with fellow Calumet County Health and Human Services staff member Kristi LeClair.

56.     On May 30, 2019, Dr. Karen Ronquillo, after having access to Demetrius's medical file and above records, evaluated Demetrius, but there is no indication that she discussed psychotropic medication, his mental health concerns, his visual and audio hallucinations, or his suicidal ideation.

57.     Demetrius submitted a written request to medical staff asking to see them because he only had a "two-week span of my meds before I flip shit." There is no record indicating anyone followed up with or responded to Demetrius's written request.

58.     Demetrius had been receiving an antibiotic for bumps he had developed on his scalp while he was in Calumet County Jail.

59.     Demetrius then spent another month in the Calumet County Jail without any mental health treatment, including counseling or medication.

60.     On July 1, 2019, approximately two months after Demetrius Stephenson was booked into the Calumet County Jail, an ACH nurse completed the initial Medical History and Health Appraisal of Demetrius that is required by Wisconsin Administrative Code 350.13(5) to be completed within 14 days of being booked into the jail.

61.     Despite the above ACH nurse noting in Demetrius's initial health assessment that he was under the care of an outside practitioner for his anxiety and depression and that he has a history of suicide attempts, including a suicide attempt "1 week ago," the ACH nurse did not do anything to further evaluate any of those concerns or refer Mr. Stephenson to a medical provider or mental health provider for evaluation or treatment.

62.     On the health assessment form, there is a referral section with boxes for mental health, dentist, medical, wound care, other, or chronic clinic. The ACH nurse did not check a box.

63.     On July 2, 2019, Klotz asked Hoering how Demetrius was doing. Hoering responded that Demetrius was "very up and down." Apparently satisfied, Klotz responded, "Ok, let me know if he (or you) would like me to come down to see him."

64.     On July 6, 2019, Dr. Karen Ronquillo reviewed and signed off on Demetrius Stephenson's above July 1, 2019, initial healthcare assessment without doing anything to further evaluate any of the above-listed concerns and without referring Demetrius to a mental health provider.

65.     Demetrius was briefly transferred to the Winnebago County Jail from August 2, 2019, to August 5, 2019.

66. On August 2, 2019, Calumet County Jail nurse Ashley Pfeifer reviewed Demetrius's medical file and sent a health transfer summary to Winnebago County Jail indicating that Demetrius had a history of prior suicide attempts and threats.

67. On August 5, 2019, Winnebago County Jail sent a health transfer summary to Calumet County Jail indicating that Demetrius had a history of prior suicide attempts and threats. That form was acknowledged as being received by Calumet County Jail correctional officer Steven Johannes on August 5, 2019.

68. On August 12, 2019, in the afternoon, Calumet County Jail correctional officers informed Hoerning that Demetrius submitted a written request saying that his depression is going to be the end of him, that Demetrius was making statements to the above-named Calumet County Jail correctional officers that he was going to commit suicide by hanging himself in his cell, and that he wanted to talk to a mental health professional immediately. The Calumet County Jail correctional officers who were working at the jail that afternoon were Maggie Ratajczak, Steve Johannes, Lori Fleming, and Elizabeth Zahrobsky.

69. On August 12, 2019, at approximately 3:24 p.m., Elizabeth Zahrobsky, stopped at Demetrius's cell and collected an inmate request slip from him which said, "Please I need to talk with doctor or someone because my depression […] is going to be the end of me." Zahrobsky spoke with Demetrius, who told her that he wanted to talk to someone about his depression. This form was also reviewed by Hoerning.

70. On August 12, 2019, at approximately 3:24 p.m., Hoerning emailed Klotz, LeClair, and Kurt Kohler telling them that Calumet County Jail correctional officers were

telling her that Demetrius was saying that he was having a hard time because his sister was just raped and that he was asking to speak to a mental health professional. The Calumet County Jail correctional officers who were working at the jail that afternoon were Maggie Ratajczak, Steve Johannes, Lori Fleming, and Elizabeth Zahrobsky.

71.     On August 12, 2019, Klotz responded to Hoerning and asked whether Demetrius had expressed any suicidal thoughts or statements.

72.     On August 12, 2019, at 4:11 p.m., Hoerning replied that Calumet County Jail correctional officers were telling her that Demetrius was "borderline suicidal" and that "he remembers what happened last time with the smock."

73.     On August 13, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Shannon Teska. Demetrius told Teska, "I wish I was dead"; that he wasn't sure how he will make it another five months in jail; that he was thinking of hanging himself; that he was set off because of a phone call with his mother yesterday where he learned that his sister was hospitalized because she attempted to commit suicide; that he has previously attempted to commit suicide by overdosing on heroin; that he wants ongoing mental health care; and that he has been diagnosed with depression and bipolar disorder.

74.     Demetrius told Teska he was thinking about hanging himself in his cell. The form Teska was using asked her to "specify any apparent lethality of any threat and the availability of the means to carry out the threat, including the individual's access to any weapon or other object which may be used for doing harm." Teska wrote, "No attempt," in response to that question.

75.     On August 13, 2019, Calumet County Health and Human Services staff member Teska emailed the information contained in the above paragraph to Brett Bowe, Kurt Kohler, Julie Hoerning, Kristen Klotz, and Kristi LeClaire.

76.     Teska did not place Demetrius on suicide watch, and she did not refer him to a doctor.

77.     On August 15, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Klotz. Demetrius told Klotz that he had not been drinking water; that he did not eat breakfast this morning and flushed it down the toilet; that he is struggling with knowing that his sister recently attempted to commit suicide; and that he planned to kill himself after his next court date if he wasn't released from jail.

78.     On August 15, 2019, Calumet County Health and Human Services staff member Klotz, emailed the information contained in the above paragraph to all of the above-named "jail staff" defendants.

79.     On or about August 16, 2019, Demetrius's pod mates informed jail staff that Demetrius was saying, every day, that he was going to kill himself, and they asked the correctional officers to help Demetrius.

80.     Demetrius specifically told Klotz that his plan was to kill himself after his next court date if he was not released from jail. Klotz described this discussion, saying that Demetrius "gave no specific plan" to kill himself.

81.     While Demetrius was housed in the Calumet County Jail, he pressed the emergency button in his cell and requested to talk to a mental health professional multiple times.

82. On August 20, 2019, Demetrius spoke with Calumet County Health and Human Services staff member Klotz.

83. Demetrius again told Klotz that he planned to kill himself after his next court date if he was not released. Klotz wrote that Demetrius denied any suicidal ideation, intent, or plan. But Klotz was aware that Demetrius had just been threatening to kill himself. Worse, he specifically told Klotz what his plan was, which Klotz recorded: "He did state again that he would kill himself after court if he is not released, but appears less fixated on this."

84. On August 20, 2019, Calumet County Health and Human Services staff member Klotz, emailed the information contained in the above paragraph to all of the above-named "jail staff" defendants.

85. Since May 6, 2019, neither Klotz nor anyone else ever placed Demetrius on suicide watch. And during the entire time that Demetrius was in the Calumet County Jail, no one did anything to follow up on, treat, or address the reported depression, previous suicide attempt, paranoia, or need for Schizophrenia medication; diagnose or treat his visual and auditory hallucinations; or address his suicidal ideations.

86. Later that evening, on August 20, 2019, Demetrius was found hanging in his cell at the Calumet County Jail.

87. Demetrius L. Stephenson died early in the morning of August 21, 2019. He died at the Ascension Calumet Hospital as a result of injuries from hanging himself while in custody at the Calumet County Jail.

88.     During the month of August 2019, the number of lockup inmates at the Calumet County Jail ranged from 15 to 19 individuals. Because there were so few inmates and so few medical staff at the Calumet County Jail, every above-named Calumet County Jail medical staff member was aware that Demetrius was suicidal.

89.     During the month of August 2019, the number of lockup inmates at the Calumet County Jail ranged from 15 to 19 individuals. Because there were so few inmates and so few correctional officers at the Calumet County Jail, every above-named Calumet County Jail correctional officer observed Demetrius during their shift and each was aware that Demetrius was suicidal.

90.     Calumet County took Demetrius into legal and physical custody, thereby establishing a special custodial and supervisory relationship toward him by Calumet County and the individually named defendants to provide necessary medical care. This special custodial and supervisory relationship consequently gave rise to affirmative contractual legal duties by Calumet County and its employees, agents, and contractors to secure Demetrius's liberty interests and rights, including his physical safety; essential medical care and treatment; and his right to be free from unnecessary pain and suffering, which are substantive rights protected by the Fourth, Fourteenth, and Eighth Amendments to the U.S. Constitution—rights which Calumet County violated.

91.     The Calumet County Jail staff Defendants and medical Defendants ignored Demetrius's need for medical and mental healthcare and medication and his calls for help.

92.     Other than when Demetrius was booked into the Calumet County Jail on May 3, 2019, none of the Defendants placed Demetrius on suicide watch, though they all had the power to do so.

93.     None of the Defendants took steps to ensure that Demetrius had access to prescription medication to treat his Schizophrenia or to ensure that Demetrius received the immediate mental healthcare attention that he needed while he was in jail.

94.     None of the Defendants contacted Demetrius's physician or outside healthcare provider to identify Demetrius's precise medical and mental health conditions, diagnoses, history of being hospitalized for attempting suicide, prescriptions, or the risk of going without his medications.

95.     The ACH contract with Calumet County specifies that mental health services and "crisis intervention services will be provided by the FACILITY staff in concert with ACH staff" and that "ACH will use an integrated and multidisciplinary team (including FACILITY staff) to develop treatment plans for inmates displaying problematic behavior."

96.     ACH failed to provide any crisis intervention services to Demetrius, let alone use an "integrated and multidisciplinary team … to develop treatment plans" for Demetrius.

97.     It was obvious to anyone and everyone who had contact with Demetrius that he was suicidal, that his life was in danger, and that he needed immediate medical and mental health attention and treatment.

98.     Defendants Calumet County and ACH failed to have a sufficient policy or protocol in place to protect inmates who repeatedly reported suicidal ideation.

99.     Demetrius's serious medical needs were ignored because of the policies and practices of ACH, USA Medical, and Calumet County, pursuant to which the serious medical needs of people detained at the Calumet County Jail are routinely ignored.

100.     The foregoing events are the result of policies and practices instituted by the Defendants which prioritize low costs for jailers and profits for ACH and USA Medical, at the expense of the health and lives of people who are detained in jails serviced by ACH and USA Medical, including Calumet County inmates.

**ADDITIONAL FACTS CONCERNING JAIL INSPECTIONS**

101.     The Wisconsin Department of Corrections Office of Detention Facilities performed an annual inspection of the Calumet County Jail in 2018 and cited the jail for violating the minimum standards for operating jails under Wisconsin Administrative Code Chapter 350. Specifically, the DOC cited the jail for violating DOC 350.13(5) for failing to complete an initial healthcare assessment of new inmates within 14 days after booking into the jail.

102.     The DOC's 2018 annual inspection report of the Calumet County Jail noted that the inspector discussed specific recommendations with the jail administration regarding the staffing levels of the medical and mental health services. Specifically, the inspection report noted that a "[r]eview of current hours should be completed to ensure facility needs are being met with regard to overall provision to include the hours of service provision."

103.     The DOC's 2018 annual inspection report of the Calumet County Jail noted that jail administration was aware that the jail was failing to comply with Wis. Admin.

Code DOC 350.13(5) by not completing initial healthcare assessments of new inmates within 14 days after booking into the jail. Specifically, the inspection report noted that the "jail Administration advised they are working on process to gain compliance in this area." The report specifically indicated that non-compliance was verbally confirmed by facility staff and that "[l]imited nursing hours may be a factor in this area."

104.     Despite being booked into the Calumet County Jail on May 2, 2019, medical staff at the jail did not complete an initial healthcare assessment of Demetrius Stephenson within the required 14-day period. The initial healthcare assessment of Demetrius Stephenson was not completed until July 1, 2019, two months after he was booked into the Calumet County Jail.

105.     Despite the Wisconsin Department of Corrections Office of Detention Facilities annual inspection report expressing concerns about the nurse staffing levels at Calumet County Jail in 2018, the county and jail administration did not make any changes to the nursing or medical staffing levels at the jail. From May to August 2019, Calumet County Jail only employ a nurse or other medical staff only two days a week and instead left it up to non-medical jail staff to "care" for Demetrius most days.

106.     The Wisconsin Department of Corrections Office of Detention Facilities performed an annual inspection of the Calumet County Jail again in 2019 and cited the jail for violating the minimum standards for operating jails under Wisconsin Administrative Code Chapter 350. Specifically, the DOC cited Calumet County for violating DOC 350.17(11) for failing to train jail staff regarding suicide prevention and identification of suicide risk factors, concluding, "This Training was not completed in 2019."

107. The DOC's 2019 annual inspection of the Calumet County Jail cited the jail for violating the minimum standards for operating jails under Wisconsin Administrative Code Chapter 350. Specifically, the DOC cited Calumet County for violating DOC 350.14(6)(6) for failing to train jail staff regarding health care policies and procedures, medications, and health screening at the time of admission, concluding, "This Training was not completed in 2019."

108. The DOC's 2019 annual inspection report of the Calumet County Jail noted that jail administration was aware that the jail's medical and mental health services were understaffed, including specifically that the jail "[a]dministration has identified an operational need for increased daily hours of medical coverage." Despite the jail administration's awareness that the jail medical and mental health services were understaffed, the DOC's 2020 annual inspection report of the Calumet County Jail again noted that jail administration was aware that the jail medical and mental health services were understaffed, including specifically that a "[r]eview of current hours in both areas [medical and mental health] should be completed to ensure facility needs are being met with regard to overall provision to include the hours of service provision. Administration has identified an operational need for increased daily hours of medical coverage that I would encourage be explored."

## ADDITIONAL FACTS CONCERNING ACH PRACTICES

109. ACH is a private for-profit contract medical care provider in jails throughout the United States.

110.     ACH advertises on its website that it "is the nation's largest jail contract management company, managing contracts for health care teams and customized programs in a variety of correctional settings" and that it operates in "over 370" locations in "21 states."

111.     ACH markets itself to jails based on its cost-cutting model, which includes contracting with the jails to have minimal medical staff present at the jail and training ACH employees and correctional officers to provide inmates with only "the minimum level of medical care required by the Constitution." ACH achieves this by, among other ways, cutting medical costs by refusing to send inmates to the hospital or outside medical providers and cutting pharmaceutical costs by denying inmates medication prescribed by outside medical providers.

112.     ACH expands its business and increases its revenue by underbidding its competition to win contracts to provide healthcare inside jails and then implements severe cost control measures to make a profit. This is done by denying and delaying medical care resulting in unnecessary suffering and deaths of people detained in the jails.

113.     When ACH representatives make their sales pitch to jails and counties for the healthcare contracts for the jails, they explain that they can deliver significant savings in managing the healthcare costs for the jail because their medical staff is "correctional trained" to deliver a lower standard of healthcare than what most people are used to getting from a "community healthcare" provider outside of the jail.

114.     The ACH Director of Marketing and Sales for example, has explained to potential customers during a sales pitch to a jail and county that ACH can achieve

substantial savings by helping the jail "control your pharmaceuticals" by having the ACH doctors deny prescription medications that people in the jail were currently taking, including psychotropic medication because their jail had "a lot of inappropriate high dollar pharmaceuticals in their facility." The marketing and sales director went on to explain that she did not mean to insult the jail's current doctor, and that he was probably a good doctor for people outside of jail. "But the correctional environment is different."

115. The ACH CEO for example, has explained to potential customers during a sales pitch to a jail and county that the county could save a lot of money if they contracted with ACH. During that presentation, the CEO was asked how ACH could provide healthcare services at a lower cost than the county. The ACH CEO responded, "The way it saves money is [ACH does] absolutely everything that is necessary for the care of the inmates. [ACH doesn't] do absolutely everything the inmates want and when you start operating that way, the costs come way, way down."

116. The CEO of ACH specifically trains ACH employees and correctional officers to cut costs and deliver minimal healthcare with the number one stated objective of the training being to teach ACH employees to "distinguish correctional from community healthcare." The training teaches ACH employees and jail staff to ignore or discount the medical concerns identified by persons in jails as things a person "wants" rather than legitimate medical needs, and it emphasizes that "inmates seek excellent medical care" in jails, but "[j]ails are not health spas, but places where people are incarcerated" and "you must give them everything they need, not anything they want," thus encouraging ACH employees and jail staff to ignore many medical concerns raised by the detainees housed

there. The ACH training explicitly instructs ACH employees to only provide "the minimum level of medical care required by the Constitution." Trainings of this sort are repeatedly provided to ACH employees and correctional staff at facilities serviced by ACH.

117.    The ACH sales pitches to jails and counties further explain that they structure the ACH contract with the jail to financially incentivize both ACH and the jail to reduce costs associated with prescription medication and costs associated with sending inmates for medical treatment outside the jail.

118.    This mutual financial incentive to keep pharmaceutical and outside healthcare costs down is often set up in the contract with an annual "liability cap" that is a specified dollar amount to cover expenses like pharmaceuticals and outside healthcare costs. ACH agrees to pay for expenses like pharmaceuticals and outside healthcare costs up to the "liability cap" amount and if those annual expenses stay below the "liability cap" ACH keeps the unused portion of the liability cap as additional profit. But if the annual expenses for things like pharmaceuticals and outside healthcare exceed the "liability cap" then the jail or the county has to pay for all the expenses above the "liability cap." This contractual agreement provides a financial incentive to the jail to not pressure ACH to provide better healthcare at the jail, resulting in lower costs to the jail and more profit to ACH.

119.    The ACH CEO, for example, has explained to potential customers that the liability caps are rarely reached. And that exceeding the cap would not benefit either ACH or the jail, saying they "cannot let [expenses] go over [liability limit], because if it does, [ACH is] not making money and [the county is] spending money and the only way we can

keep this thing going is to keep [the county] very happy which [ACH has] been very good at."

120.    The ACH sales pitches attempt to convince the jail and county that they can save money by providing this lower standard of correctional healthcare and deny individuals expensive prescription medication inside the jail without exposing the jail or county to significant risks or costs associated with being sued for engaging in this type of conduct.

121.    The ACH CEO, for example, has explained to potential customers that "one of the first things" ACH does is "train the staff, not just the nurses but the correctional officers [on] how to not take any medical responsibility, because right now they are taking responsibility as they have to make a judgment call as to whether somebody goes to the doctor, et cetera."

122.    The ACH CEO, for example, has explained to potential customers that "[ACH is] very cognizant of inmate lawsuits and the eighth amendment rights of inmates" and also said, "So [we] are very specific about how [we] do this."

123.    The CEO of ACH specifically trains ACH employees and correctional officers to cut costs and trains them that they can refuse to follow the orders of outside doctors without getting into legal trouble if they get an ACH doctor to order or approve the refusal. Thus, before there is even an actual inmate making an actual medical request, ACH is already planning to deny medical treatment. The training specifically teaches ACH employees that if they get an ACH doctor to agree that a detainee does not "need" what the outside doctor ordered or prescribed, then they do not have to legally comply with the

outside doctor's order because if the ACH doctor disagrees it is not deliberate indifference, it is an "independent medical evaluation" or "is merely a disagreement over a treatment decision" according to ACH's cost-savings-oriented policies. Trainings of this sort are repeatedly provided to ACH employees and correctional staff at facilities serviced by ACH.

124.     The CEO of ACH specifically trains ACH employees and correctional officers to cut costs and gives a specific example where a detainee in jail wanted "psychiatric medications his community psychiatrist had prescribed," but the ACH doctor denied the detainee two of these psychiatric medications. Then, the CEO further explained, the "[c]ommunity psychiatrist mailed the jail all 3 prescriptions with a letter demanding that they be continued." The ACH CEO explained that the jail can operate in this fashion without getting into legal trouble because "jail staff did not deny access to care," but rather "[t]he jail staff followed the [ACH] doctor's orders" and "[t]he Sheriff has no duty to give an inmate medications prescribed by an outside doctor who was no longer treating the inmate without first consulting the jail doctor." Trainings of this sort are repeatedly provided to ACH employees and correctional staff at facilities serviced by ACH.

125.     To further align the mutual financial interests of ACH and its jail customers, ACH indemnifies its jail customers, like Calumet County, through substantial insurance coverage, and as a result, ACH's jail customers, including Calumet County, are willing to hire companies like ACH with poor track records in providing appropriate medical care.

126.     The ACH contract with Calumet County requires ACH to purchase an insurance policy that includes insurance for the Sheriff and Calumet County for ACH's

civil rights violations with minimum limits of $1,000,000 per occurrence and $3,000,000 annual aggregate.

127.    Despite the lawsuits from inmates who have been injured or have died because of ACH's cost-cutting practices, ACH makes so much money that they are able to continue to pay out for both settlements and jury verdicts related to claims they provided constitutionally deficient healthcare without undermining their profitability.

128.    ACH's minimalist, low-cost approach to healthcare, which aims to provide the cheapest, most minimal response to inmates' medical needs, results in woefully deficient medical care, unnecessary pain, suffering, permanent injuries, and death.

129.    ACH is aware that its approach fails to provide adequate medical care to people in custody, resulting in treatable or manageable medical needs developing into serious, life-threatening conditions, and death of inmates. But the occasional pay-out for a properly exhausted and adequately litigated civil rights violation, to ACH, is just part of the cost of doing business.

130.    ACH is deliberately indifferent to the danger that its practices will result in substandard or even catastrophic medical care and continues to maintain its same low-cost minimalist approach because it is so profitable for the company to continue to do so.

**RELATIONSHIP BETWEEN ACH AND USA MEDICAL**

131.    Defendant USA Medical & Psychological Staffing, S.C. ("USA Medical") is a Service Corporation. All shareholders, directors, and officers of USA Medical are employees or owners of ACH.

132.     ACH outsources or subcontracts the performance of services that require licensure to practice medicine on all its jail contracts to USA Medical.

133.     ACH has previously stated in this case that: ACH is and was not the employer of any of the individual defendants. Rather, ACH contracts to provide certain services at the Calumet County Jail. ACH has an agreement with USA Medical Staffing, a Wisconsin professional service corporation. USA Medical Staffing is the employer of the individual medical defendants.

134.     ACH has previously stated in this case that: Training for USA Medical Staffing employees is provided by USA Medical Staffing and Spark Training, LLC. This training is consistent with correctional medical standards and instructs that costs are not to be a barrier to patient care or medications.

135.     USA Medical has the same mailing address, suite number, and phone number as ACH.  The contact information for USA Medical is an ACH employee and USA Medical's email address is an ACH-domain email address, "businessreg@advancedch.com."

136.     Norman Johnson is or was the president and CEO of ACH.  He is or was also an incorporator, shareholder, and director of USA Medical.

137.     On information and belief, USA Medical's only client is ACH.

138.     USA Medical was incorporated in 2018 by ACH, its owners, and/or its directors.

139.     As a service corporation, USA Medical engages in the practice of medicine.

140.     USA Medical was incorporated at least in part to comply with laws requiring the owners of a corporation engaged in a licensed practice (such as medicine) to be licensed in that practice.

141.     ACH exercises control over the manner of means by which USA Medical and its employees and officers perform their medical duties.

142.     ACH exercises administrative supervision over USA Medical and its employees necessary to ensure the fulfillment of the obligations of ACH's contracts at the facilities it services, including Calumet County.

143.     USA Medical operates as a subcontractor to ACH or a subsidiary of ACH.

144.     USA Medical employed Dr. Karen Ronquillo, Ashley Pfeifer and Roxanne Morris as employees or independent contractors.

145.     ACH and/or Norman Johnson exercises complete domination over USA Medical's finances, policy, and business practices with respect to USA Medical's medical practice, such that USA Medical has no separate mind or existence from these persons.

146.     USA Medical, its owners, and its directors did not change the ACH policies and practices described in this complaint.

147.     ACH used its control over USA Medical to commit the wrongs alleged in this complaint.

148.     ACH's control over USA Medical caused the injuries alleged in this complaint.

149.     USA Medical operates under the policies and practices of ACH and USA Medical has adopted those policies and practices as USA Medical's own policies and practices.

## COUNT 1:

## 42 U.S.C. § 1983 Claim for deprivation of due process by deliberate indifference against non-medical staff Defendants

150.     Plaintiff realleges the above paragraphs.

151.     Demetrius Stephenson, at all times relevant to this complaint, was a pretrial detainee.

152.     Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, and Bowe were subjectively and objectively, deliberately indifferent to Demetrius's serious medical condition of being suicidal.

153.     There was a strong likelihood that Demetrius would commit suicide.

154.     Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, and Bowe knew of that strong likelihood or strongly suspected the likelihood existed.

155.     The conduct of each of the Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, and Bowe, given their knowledge or strong suspicions, were objectively unreasonable and caused Demetrius's injuries.

156.     Had Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, and Bowe not acted in a manner that was objectively unreasonable, Demetrius would not have hanged himself in his jail cell.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, and Bowe, and because they acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 2:

### 42 U.S.C. § 1983 Claim for deprivation of due process by deliberate indifference against medical staff Defendants

157.     Plaintiff realleges the above paragraphs.

158.     Demetrius Stephenson, at all times relevant to this complaint, was a pretrial detainee.

159.     Defendants Pfeifer, Morris, Ronquillo, Klotz, Teska, and LeClair were subjectively and objectively, deliberately indifferent to Demetrius's serious medical condition of being suicidal.

160.     There was a strong likelihood that Demetrius would commit suicide.

161.     Defendants Pfeifer, Morris, Ronquillo, Klotz, Teska, and LeClair knew of that strong likelihood or strongly suspected the likelihood existed.

162.     The conduct of each of the Defendants Pfeifer, Morris, Ronquillo, Klotz, Teska, and LeClair, given their knowledge or strong suspicions, were objectively unreasonable and caused Demetrius's injuries.

163.     Had Defendants Pfeifer, Morris, Ronquillo, Klotz, Teska, and LeClair not acted in a manner that was objectively unreasonable, Demetrius would not have hanged himself in his jail cell.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Pfeifer, Morris, Ronquillo, Klotz, Teska, and LeClair, and because they acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 3:

### 42 U.S.C. § 1983 *Monell*[2] claim against Defendant Calumet County

164.     Plaintiff realleges the above paragraphs.

165.     Defendant Calumet County authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*, including detainee medical decisions made irrespective of appropriate medical judgment, which were objectively unreasonable and exhibited substantial departure from accepted professional judgment, practices, and/or standards, and which were also deliberately indifferent to the safety and suffering of detainees with serious medical conditions, including Demetrius Stephenson in violation of his rights protected by the Fourth, Eighth,

---

[2] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

and Fourteenth Amendments to the United States Constitution. These policies, practices, and customs were the moving force which caused the deprivation of Plaintiff's constitutional rights.

166.     Defendant Calumet County failed to adequately train and supervise their employees and maintained practices or processes pursuant to which detainees like Demetrius with serious medical needs were routinely denied medical care and access to medical care.

167.     Defendant Calumet County's policies, customs, practices, supervision of employees, or lack thereof was a direct cause or moving force which caused the deprivation of Plaintiff's constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant Calumet County, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 4:

### 42 U.S.C. § 1983 *Monell*[3] claim against Defendant ACH and USA Medical

168.     Plaintiff realleges the above paragraphs.

169.     Defendant ACH and USA Medical authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*, including detainee medical decisions made irrespective of appropriate medical judgment, which were objectively unreasonable and exhibited substantial departure from accepted professional judgment, practices, and/or standards, and which were also deliberately

---

[3] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

indifferent to the safety and suffering of detainees with serious medical conditions, including Demetrius Stephenson in violation of his rights protected by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. These policies, practices, and customs were the moving force which caused the deprivation of Plaintiff's constitutional rights.

170.     Defendant ACH and USA Medical failed to adequately train and supervise their employees and maintained practices or processes pursuant to which detainees like Demetrius with serious medical needs were routinely denied medical care and access to medical care.

171.     Specifically, there exist policies and widespread practices within the facilities at which ACH and USA Medical is contracted to provide medical care, including the Calumet County Jail, pursuant to which detainees receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which (1) healthcare staff commonly disregard reports by patients of objectively serious medical needs; (2) healthcare staff refuse to provide adequate treatment to patients complaining of serious medical conditions or in need of medications; (3) healthcare staff fail to ensure continuity of care among medical and correctional staff; (4) employees prioritize profits and maintaining a competitive edge as a low-cost vendor at the expense of constitutionally adequate care; (5) inadequate levels of health care staffing are provided, including inadequately qualified staff; and (6) healthcare staff fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

172.     Defendant ACH and USA Medical allowed these policies and practices to flourish because ACH and USA Medical, which directs the provision of healthcare services at numerous jails including the Calumet County Jail, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.

173.     Defendant ACH and USA Medical's policies, customs, practices, supervision of employees, or lack thereof was a direct cause or moving force which caused the deprivation of Plaintiff's constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant ACH, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## COUNT 5:

## 42 U.S.C. §§ 12111–213, Title II of the Americans with Disabilities Act ("ADA") claim against Calumet County

174.     Plaintiff realleges the above paragraphs.

175.     Plaintiff Demetrius Stephenson is a qualified person under the ADA because he had a disability.

176.     Demetrius was disabled in that he suffered from anxiety, depression, bi-polar disorder, schizophrenia, and suicidal ideation.

177.     Demetrius's disabilities substantially limited major life activities, including breathing, concentrating, thinking, communicating, interacting with others, and caring for himself.

178.     Defendants Calumet County failed to reasonably accommodate Demetrius or discriminated against Demetrius by not placing him on suicide watch, denying him medication requests, failing to adequately monitor him, and denying him adequate mental health treatment.

179.     Calumet County's failure to reasonably accommodate Demetrius or their discrimination against Demetrius because of his disability effectively denied Demetrius's access to programs and activities in the Calumet County Jail.

180.     Calumet County's policies, procedures, and rules that prevent an inmate from reporting health or suicide concerns in writing to correctional staff on weekends or holidays or on any weekday after 8:00 a.m. disproportionally affects disabled people, especially those with mental illnesses and those who are suicidal.

WHEREFORE, pursuant to the ADA, Plaintiff demands actual or compensatory damages against Defendant Calumet County, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

### COUNT 6:

### 29 U.S.C. §§ 794–94e, Rehabilitation Act, claim against Calumet County

181.     Plaintiff realleges the above paragraphs.

182.     Defendants Calumet County receives federal funds.

183.     Plaintiff Demetrius Stephenson is a qualified person under the Rehabilitation Act because he had a disability.

184.     Demetrius was disabled in that he suffered from anxiety, depression, bi-polar disorder, schizophrenia, and suicidal ideation.

185.     Demetrius's disabilities substantially limited major life activities, including breathing, concentrating, thinking, communicating, interacting with others, and caring for herself.

186.     Defendants Calumet County failed to reasonably accommodate Demetrius or discriminated against Demetrius by not placing him on suicide watch, denying him medication requests, failing to adequately monitor him, and denying his mental health treatment.

187.     Calumet County's failure to reasonably accommodate Demetrius or their discrimination against Demetrius because of his disability effectively denied Demetrius's access to programs and activities in the Calumet County Jail.

188.     Calumet County's policies, procedures, and rules that prevent an inmate from reporting health or suicide concerns in writing to correctional staff on weekends or holidays or on any weekday after 8:00 a.m. disproportionally affects disabled people, especially those with mental illnesses and those who are suicidal.

WHEREFORE, pursuant to the Rehabilitation Act, Plaintiff demands actual or compensatory damages against Defendant Calumet County, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

**COUNT 7:**

## Indemnification Claim against Calumet County

189.     Plaintiff realleges the above paragraphs.

190.     Wisconsin law, WIS. STAT. § 895.46, requires public entities to pay any tort judgement for damages for which employees are liable, for acts within the scope of their employment.

191.     At all times relevant to this action, Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, Bowe, Klotz, Teska, and LeClair engaged in the conduct complained of while in the course of and scope of their employment with Calumet County.

WHEREFORE, Plaintiff asks this Court to find that Calumet County is liable to defend this action against Defendants Ratajczak, Dedering, Rumpff, Fleming, Mayer, Sentek, Johannes, Breit, Kohler, Zahrobsky, Post, Knuppel, Van Oss, Vang, Hoerning, Bowe, Klotz, Teska, and LeClair and to satisfy any judgment entered against them, by virtue of WIS. STAT. § 895.46.


## JURY DEMAND

85.     Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: August 14, 2023

/s/ John H. Bradley
John H. Bradley
  Wisconsin Bar No. 1053124
R. Rick Resch

Wisconsin Bar No. 1117722
Strang Bradley, LLC
613 Williamson St., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com

Attorneys for Plaintiff