IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF DEMETRIUS L. STEPHENSON
BY SPECIAL ADMINISTRATOR RICHARD COAD,

      Plaintiff,

v.                                             Case No. 22-CV-956

CALUMET COUNTY, et al.,

      Defendants.

---

**CALUMET COUNTY JAIL DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

---

Defendants Calumet County, Kurt Kohler, Elizabeth Zahrobsky, Julie Hoerning, and Brett Bowe (collectively, the "Jail Defendants"), by their attorneys, CRIVELLO, NICHOLS & HALL, S.C., respectfully submit this Brief in support of their Motion for Summary Judgment. Plaintiff cannot establish that the Jail Defendants knew or should have known that Demetrius Stephenson was at a substantial risk of committing suicide based on the information known to them, or that their response to the information known was objectively unreasonable.

## FACTS

All material facts supporting the County Jail Defendants' Motion are stated in full and supported by citations to admissible evidence in the Jail Defendants' Proposed Findings of Fact ("JDPFOF"). The facts are also explained in more detail as relevant to each of the Jail Defendants' defenses, *infra*. Very briefly, 17-year-old Demetrius Stephenson was booked into Calumet County Jail ("CCJ") on May 2, 2019. (JDPFOF 1-7, 18.) By May 3, 2019, he told Sergeant Julie Hoerning that a voice was telling him to cut his wrists, that he really wanted to do it, and that he wanted to go to sleep and never wake up. (JDPFOF 19-22.) In 2019, Calumet County Human Services ("HHS") provided emergency crisis intervention services to inmates at CCJ. (JDPFOF 9-12, 28.) Therefore, Sergeant

Hoerning called HHS for a crisis assessment and placed Stephenson on suicide watch. (JDPFOF 23, 26, 29-52.) An HHS therapist met with Stephenson on May 6, 2019, and cleared Stephenson to be removed from suicide watch, because he denied any current suicidal ideation, intent, or plan. (JDPFOF 53-60.) HHS followed up with Stephenson on May 14th, 20th, and 29th, and they never reported any concerns following those visits that Stephenson might be hallucinating, suicidal, or depressed. (JDPFOF 61-67.)

In 2019, Calumet County contracted with Advanced Correctional Healthcare, Inc. ("ACH") to provide all "on-site health evaluations and medical care" to inmates confined in the Calumet County Jail, except for elective care, crisis intervention services, and off-site services. (JDPFOF 10.) Stephenson was aware of the procedure to obtain medical care, and he followed this procedure by submitting Sick Call Request slips while he was incarcerated. (JDPFOF 14-17, 68-70.) None of these request slips stated that he was feeling suicidal or depressed. (JDPFOF 68-69.) Stephenson was seen by ACH staff in the Health Services Unit ("HSU") on July 1, 2019, for his health appraisal, and ACH never indicated to jail staff that Stephenson was suicidal or in need of any kind of heightened monitoring or intervention. (JDPFOF 92-94.) There is no evidence that Stephenson was actively taking any kind of prescription medication at the time of his booking, and ACH staff did not discontinue or change any active prescriptions at any time. (JDPFOF 5, 135-138.)

In June, during a routine cell search, Officer Elizabeth Zahrobsky found a homemade Ouija board in Stephenson's cell, along with pencil drawings on the walls and ceiling that referenced "666" and Satanic crosses. (JDPFOF 72-74.) At this time, Stephenson did not appear to be depressed or suicidal and he did not request any kind of medical or mental health care. (JDPFOF 75-80, 127-134.) Throughout June and July 2019, jail staff occasionally observed Stephenson to have ups and downs. (JDPFOF 85-91.) But jail staff often observed inmates who seemed down about being incarcerated. Stephenson's ups and downs were nothing out of the ordinary. (JDPFOF 90-91.)

On the afternoon of August 12, 2019, Stephenson learned that his sister had been sexually

assaulted. (JDPFOF 100.) He was distraught and appeared to officers to be "borderline suicidal." (JDPFOF 101-105.) Therefore, Sergeant Hoerning contacted HHS requesting a crisis assessment. (JDPFOF 103-106.) HHS therapist Shannon Teska met with Stephenson on the morning of August 13th and then emailed a copy of her crisis assessment and plan to the jail that same morning. (JDPFOF 107-109.) Teska's assessment stated in relevant part that Stephenson denied being actively suicidal and had no intentions of harming himself in any way; that an HHS therapist would come to meet with Stephenson again on August 15, 2019; and Stephenson agreed that he would ask for someone to see him sooner if anything changed but that he did not think that would be necessary. (JDPFOF 109.)

As planned, an HHS therapist met with Stephenson on August 15th and again on the morning of August 20th. (JDPFOF 112-114, 121-123.) She never reported any concerns to any jail staff following those visits that Stephenson might be suicidal or that he might need any kind of increased monitoring or intervention. (JDPFOF 114, 123.) Jail staff otherwise observed Stephenson acting normally. Yet just 12 hours after his August 20th visit, at approximately 12:04 a.m. on August 21, 2019, jail staff found Stephenson hanging in his cell. (JDPFOF 124-126.)

## ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate the specific facts showing that there is a genuine issue for trial. *Id.* at 248. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Critically, speculation, hearsay and conclusory allegations are insufficient to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Here, the undisputed facts show that no reasonable jury could find in favor of Plaintiff. Therefore, the County Jail Defendants are entitled to judgment as a matter of law.

## II. PLAINTIFF'S FOURTEENTH AMENDMENT INDIVIDUAL CAPACITY CLAIMS FAIL AS A MATTER OF LAW.

Under the Fourteenth Amendment's objective reasonableness standard, a plaintiff must demonstrate that 1) his medical condition was objectively serious; 2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and 3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or ... excessive in relation to that purpose." *Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (Sykes, J. concurring) (discussing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). It is not enough to show that the defendants acted out of negligence or even gross negligence. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018)). Further, mere violation of a state statute or internal jail policy do not amount to constitutional violations enforceable under 42 U.S.C. § 1983. *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir.1988) (en banc); *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). Instead, to meet this burden, the plaintiff must show that that the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda v. Cty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018).

Very recently, the Seventh Circuit summarized the "key principles for assessing objective unreasonableness" in jail suicide cases:

An express statement that the deceased was not considering suicide from the deceased himself weighs heavily against objective unreasonableness. That conclusion flows from a recognition of on-the-ground circumstances: practically speaking, not every prisoner who shows signs of depression can or should be put on suicide watch. **The facts should point directly at suicidality, for a deceased's general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide**. For that reason, when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions.

*Wallmow*, 99 F.4th at 391 (internal quotations and citations omitted) (emphasis added). Additionally, the determination of objective reasonableness is made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. Objective reasonableness "turns on the facts and circumstances of each particular case." *Id.*

The County Jail Defendants do not dispute that suicide and suicidal ideation are objectively serious medical conditions. *See McKinney v. Franklin Cnty., Illinois*, 417 F. Supp. 3d 1125, 1138 (S.D. Ill. 2019). However, the facts and existing precedent demonstrate that none of the named officers acted knowingly or recklessly. Importantly, it is well established that not every inmate who shows signs of depression or exhibits strange behavior can or should be put on suicide watch. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003). Additionally, the Seventh Circuit has long recognized that an inmate's strange behavior alone, without indications that the behavior has a substantial likelihood of taking a suicidal turn, is insufficient to impute subjective knowledge of a high suicide risk to jail personnel. *See Est. of Novack v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000); *see also Estate of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 391 (7th Cir. 2024).

1. **The Jail Defendants Lacked Notice of a Substantial Risk of Suicide.**

   a. **County Jail Defendants' Contacts with Stephenson From May, 2019 Through July, 2019.**

Even taken in the light most favorable to Plaintiff, the evidence is insufficient to establish that the Jail Defendants had actual knowledge of facts to put them on notice of a substantial risk that

Stephenson would imminently attempt suicide. Shortly after booking, on May 3, 2019, Stephenson told officers he needed help with suicidal thoughts. (JDPFOF 19-22.) Sergeant Hoerning immediately went to speak with Stephenson, who told her that a voice was telling him to slit his wrists. Therefore, Sergeant Hoerning contacted mental health professionals at HHS to request a crisis assessment and placed Stephenson on suicide watch. (JDPFOF 20-22, 41, 46.) He was properly monitored by jail staff for multiple days every 15 minutes, which was documented on a suicide watch log. (JDPFOF 51.)

HHS therapist Kristen Klotz performed a face-to-face crisis assessment of Stephenson on May 6, 2019. (JDPFOF 53.) In her report from the visit, Klotz wrote that Stephenson told her that he saw a figure of a demon that was telling him to kill himself on May 3. However, he denied seeing or hearing the demon at the time of the assessment. (JDPFOF 55.) Klotz ultimately cleared Stephenson to be removed from suicide watch, because he explicitly denied any current suicidal ideation, intent, or plan. (JDPFOF 56.) That same morning, she communicated her conclusion to Sergeant Kurt Kohler via email: "Demetrius denies any current suicidal ideation, intent, or plan. He can be removed from suicide watch at this time. He hopes to return home after court with his foster mom. If he is not released following court, he may need to be reassessed at that time." (JDPFOF 57.) Sergeant Kohler then completed the suicide watch log and signed it, confirming that Stephenson was removed from suicide watch. (JDPFOF 60.) This was forwarded on to staff in the HSU. (*Id.*) Of the Jail Defendants, only Sergeant Kohler was aware of Stephenson's comments that told him to kill himself, because he received Klotz's Mental Health Crisis Log reporting the same. (JDPFOF 58.)

After Stephenson was cleared to return to his normal cell assignment on May 6, HHS therapists visited Stephenson for routine follow-ups on multiple occasions: May 14, May 20, and May 29. (JDPFOF 61-64.) Following those visits, neither Stephenson nor the HHS therapists ever suggested to the Jail Defendants that Stephenson was hallucinating, hearing voices, suicidal, or depressed, or that he needed to be monitored any more closely than any other inmate. (JDPFOF 67.) Calumet County correctional staff are not trained medical professionals and instead defer to trained

health care professionals employed by ACH and HHS for all inmate health care decisions. (JDPFOF 12.) And due to patient privacy protections under HIPAA, correctional staff have no access to any information in ACH or HHS records. (JDPFOF 13.) Therefore, the Jail Defendants deferred to HHS and their conclusions about Stephenson's mental state, because they were not aware of anything that would suggest their deference was unreasonable.

Stephenson was also seen by the trained health care providers in the HSU on May 30, 2019 and July 1, 2019. (JDPFOF 71, 92.) At some point prior to the May 30th visit, Stephenson submitted an undated Sick Call Request stating that he was getting bumps on his head. (JDPFOF 68.) And on May 11th, he submitted a slip stating, "Because I only have a two week span of my meds before I flip shit." (JDPFOF 69.) It is CCJ's policy and practice that corrections staff must review Sick Call Request slips before routing them to the HSU to ensure that each request does not suggest any type of life-threatening medical emergency that might require immediate intervention. (JDPFOF 142.) It is unclear which officer collected the slip about head bumps, but none of the named Jail Defendants collected the slip about medication. (JDPFOF 70.) In any event, nothing in either request slip would indicate to any reasonable officer that Stephenson was at an imminent risk of becoming suicidal, and both slips were forwarded on to the HSU to be addressed by nursing staff. Stephenson never submitted any other requests or ICFs mentioning medication or claiming that he was not receiving proper care, so officers would have no reason to suspect that Stephenson had a medical need that was not being met.

On July 1, 2019, Stephenson had a full health assessment in the HSU. (JDPFOF 92.) Neither Stephenson nor any HSU staff ever suggested to the Jail Defendants that Stephenson was hallucinating, hearing voices, suicidal, depressed, or required any kind of additional monitoring or intervention following his visits on May 30 or July 1—or at any other time. (JDPFOF 94.) The Jail Defendants did not second-guess the appropriateness of ACH's care, because they were not aware of anything that would suggest their deference was unreasonable.

On June 13, 2019, Officer Zahrobsky performed a monthly search of Stephenson's cell. His cell was a mess, and Officer Zahrobsky found a homemade Ouija board and some Satanic-themed graffiti on the cell wall and ceiling of a Satanic cross and the number 666. (JDPFOF 74.) During and after the cell search, Stephenson did not appear to be in distress or depressed, and he did not say anything to Officer Zahrobsky suggesting that he was hallucinating, hearing voices, or that he was or might become suicidal. (JDPFOF 76-80.) While Officer Zahrobsky was aware that Stephenson had been on suicide watch in early May, she was not aware that he made comments to Klotz about seeing a demon that told him to kill himself. (JDPFOF 75.)

Nothing about the state of Stephenson's cell would "point directly at suicidality" to a reasonable officer in Officer Zahrobsky's position as required under the Fourteenth Amendment. *Wallmow*, 99 F.4th at 391. Nothing about the images or Stephenson's behavior suggested that he was hallucinating or hearing voices. Inmates deface their cells all the time—that is why jails have to spell out a rule against it in their inmate handbooks. (JDPFOF 129.) That the subject matter of Stephenson's graffiti appeared to have some connection to Satan or religion does not change the analysis, particularly because nothing about the number "666" or a Satanic cross would suggest that Stephenson was hallucinating or suicidal to a reasonable person. Regardless of whether Stephenson was actually practicing Satanism, nonmainstream religions like the Church of Satan are nevertheless entitled to accommodation under the First Amendment and to application of the "substantial burden" test under the Religious Land Use and Institutionalized Persons Act. *See, e.g., Center for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 874-5 (7th Cir. 2014); *Cutter v. Wilkinson*, 544 U.S. 709, 712-713 (2005). In other words, evidence of an inmate's interest in or adherence to a religion—no matter how unconventional or even distasteful that religion might be to others—would not prompt a reasonable jail officer to leap to the conclusion that the inmate is suicidal.

Similarly, there is nothing inherently concerning about a teenaged inmate with nothing but time on his hands crafting a homemade version of a popular board game that is otherwise

commercially manufactured and marketed to children ages 8 and up[1]. (JDPFOF 132.) Although some people may still associate Ouija boards with the "Satanic Panic" of the 1980s or "breaking the veil" to speak with ghosts, the fact remains that it is a socially and culturally accepted game that has been featured in everything from Norman Rockwell's sentimental *The Saturday Evening Post* cover illustrations[2], to a 1951 episode of "I Love Lucy" called "The Séance,"[3] to a 1974 episode of the family-friendly series "The Waltons."[4] Even Officer Zahrobsky admitted that she played with a Ouija board in a cemetery with friends as a teenager. (JDPFOF 80.) Thus, Officer Zahrobsky reasonably interpreted Stephenson's drawings and creation of a Ouija board as products of a 17-year old's boredom—not a direct indication of suicidality.

The same is true for Sergeant Hoerning's impressions of Stephenson during the resulting disciplinary hearing on June 14, 2019. Stephenson admitted to making the drawings on the wall and making the Ouija board, but he did not appear to act depressed, suicidal, or somehow fixated on death. (JDPFOF 81-84.) Nor did he mention anything about hallucinating or hearing voices. (JDPFOF 84.) A few days later, Officer Zahrobsky noted that Stephenson seemed to be upset during routine rounds on June 19, 2019. (JDPFOF 85.) She did not ignore this. Instead, she inquired, and Stephenson said he was alright and did not want to talk. Other inmates confirmed to her that Stephenson was "just down today." (JDPFOF 86.) In her experience as a correctional officer and as any reasonable person would expect, Officer Zahrobsky often observed inmates who seemed down about being in jail. Based on her training, experience, and interactions with Stephenson, Officer Zahrobsky believed that Stephenson seemed like a normal inmate with normal, periodic ups and downs. (JDPFOF90-91.)

Ultimately, once Stephenson was removed from suicide watch on May 6, 2019, none of the individual Jail Defendants observed Stephenson exhibiting any kind of behavior in the months of May

---

[1] *See* https://instructions.hasbro.com/en-us/instruction/hasbro-games-ouija-game (last visited June 18, 2024.)
[2] https://www.saturdayeveningpost.com/2012/02/ouija/ (last visited June 21, 2024.)
[3] https://www.imdb.com/title/tt0609382/ (last visited June 21, 2024.)
[4] https://www.imdb.com/title/tt0743748/ (last visited June 21, 2024.)

through July that would suggest to a reasonable officer that Stephenson was hearing voices telling him to hurt himself or that he was at any kind of risk of suicide. He did not say he was or might become suicidal, and no one from ACH or HHS communicated anything to jail staff suggesting as much. When an officer has no reason to think a detainee is suicidal, "it is not objectively unreasonable to take no special precautions." *Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022).

### b. Jail Defendants' Contacts with Stephenson Between August 1, 2019, and August 21, 2019.

On August 3, 2019, Officer Zahrobsky performed another cell search and found more pencil drawings on Stephenson's cell wall and ceiling. (JDPFOF 95-97.) This time she saw a Satanic cross, the number 666 (which appeared to be the same drawing as the one found during the June 13th cell search), and what appeared to be "zo zo" or "20 20" written repeatedly. Officer Zahrobsky was not familiar with the phrase "zo zo" or the numbers "20 20" or any particular meaning they might have. (*Id.*) Regardless, nothing about Officer Zahrobsky's knowledge of Stephenson or what she found in his cell on August 3, 2019, suggested to her that Stephenson was in a depressed, suicidal, mentally or emotionally ill or disturbed, or in need of any kind of medical or mental health intervention. (JDPFOF 98-99.) Officer Zahrobsky then spoke with Stephenson about the writing on his cell walls and ceiling, and he did not say anything during this conversation suggesting that he was hallucinating or at risk of becoming depressed or suicidal. (*Id.*) The facts simply do not "point directly at suicidality." *Wallmow*, 99 F.4th at 391.

On or around August 12, 2019, Stephenson received news that his sister was sexually assaulted, and this understandably caused him distress. (JDPFOF 100.) In turn, Stephenson submitted an Inmate Communication Form stating, "Please I need to talk with [indecipherable] or someone because my depression is going to be the end of me." (JDPFOF 101.) Sergeant Hoerning received the form and immediately contacted HHS. At 3:24 p.m. on Monday, August 12th, Sergeant Hoerning emailed Klotz advising that Stephenson was asking to speak with someone. By 4:10 p.m., Klotz responded that she

did not have any availability until Thursday and said that if Stephenson needed to be seen sooner, Sergeant Hoerning could contact Kristi LeClair for an emergency crisis assessment. (JDPFOF102-105.)

Because officers had reported to Sergeant Hoerning that Stephenson was "borderline suicidal," she did not wait for Klotz to come on Thursday. Instead, Sergeant Hoerning then contacted LeClair and asked if someone else from HHS could see Stephenson sooner. (JDPFOF 106.) By approximately 9:19 a.m. the next day, August 13th, HHS therapist Shannon Teska met with Stephenson for a crisis assessment. (JDPFOF 107.) Her meeting lasted almost 90 minutes, until 10:43 a.m. (JDPFOF 108.) Following her meeting with Stephenson, Teska emailed Chief Deputy Brett Bowe, Sergeant Hoerning, Sergeant Kohler, and the jail nurse at 11:48 a.m. with a copy of her crisis assessment and plan. (JDPFOF 109.) Her assessment and plan stated in relevant part that 1) Stephenson denied being actively suicidal; 2) Stephenson had no intentions of harming himself in any way; 3) speaking with Klotz was helpful, and he wanted to speak with someone on an ongoing basis; 4) Klotz would come to meet with Stephenson again on August 15th; 5) Stephenson agreed that he would ask for someone to see him sooner if anything changed; 6) and Stephenson did not think that would be necessary. (*Id.*)

Non-medical officials like the individual Jail Defendants are entitled to defer to and rely on the professional judgement of trained medical professionals like those employed by ACH and HHS. *See Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021). Therefore, the Jail Defendants did just that: based on Teska's assessment and plan, CCJ corrections staff did not believe that Stephenson was suicidal or needed to be placed on suicide watch. (JDPFOF 110.) Although he was off of work from August 3, 2019, through August 18, 2019, Chief Deputy Bowe's eventual receipt of one of Sergeant Hoerning's August 12th emails and Teska's August 13th email was his only substantive contact with anyone about Stephenson at any time. (JDPFOF 111.)

As discussed in Teska's August 13th assessment, Klotz followed up with Stephenson on August 15, 2019. (JDPFOF 112.) Following Klotz's visit on the 15th, no one from HHS (or anyone else for that matter) indicated in any way to the Jail Defendants that Stephenson was hallucinating, upset, depressed, suicidal, or in need of any kind of medical or mental health intervention. (JDPFOF 114.) Klotz scheduled another follow up visit with Stephenson for August 20th. Because of a pre-planned vacation, Sergeant Hoerning's last day of work at CCJ was Friday, August 16, 2019—four days prior to Stephenson's suicide. (JDPFOF 115.) Based on the totality of events that occurred prior to the end of her shift on August 16th, no reasonable officer in Sergeant Hoerning's position would have appreciated any "high degree of risk" in her actions or responses. *Kemp*, 27 F.4th at 496. And because Stephenson did not commit suicide until four days later, Plaintiff cannot establish that Sergeant Hoerning's actions caused Stephenson any harm. *See, e.g., Pulera v. Sarzant*, No. 15-C-461, 2019 WL 2476978 at *7 (E.D. Wis. June 13, 2019), aff'd, 966 F.3d 540 (7th Cir. 2020) (finding no liability against officer whose last contact with inmate was 48 hours prior to suicide attempt). Therefore, the claim against her fails. Officer Zahrobsky's last shift prior to Stephenson's suicide was the morning of August 17, 2019. (JDPFOF 116.) As with Sergeant Hoerning, no reasonable officer in Officer Zahrobsky's position would have appreciated any high degree of risk with respect to the consequences of her actions as is required to find liability under the Fourteenth Amendment. *See Miranda*, 900 F.3d at 354. Therefore, the claim against her also fails.

At 6:56 a.m. on August 20, 2019, Stephenson submitted an Inmate Communication Form asking to make a free phone call because he did not have any money in his jail account. (JDPFOF 117.) The Form does not indicate why he wanted to make the call or suggest that he was upset. Officer Lori Fleming collected this request and told Stephenson he could make a phone call after his scheduled visit with Klotz later that morning. However, Officer Fleming warned Stephenson that it would not be a 15-minute call and that it would be his last free phone call. (JDPFOF 118.) Ultimately, Stephenson declined the offer for a free phone call, and Officer Fleming documented

this on the Form accordingly. (JDPFOF 119.) As is routine practice, the completed Form was then forwarded to Sergeant Kohler the same day. (JDPFOF 120.) This was Sergeant Kohler's last substantive contact with anyone that pertained to Stephenson in any way prior to Stephenson's suicide. (*Id.*) Like Sergeant Hoerning, even when considering the totality of events that occurred over the preceding 3.5 months, no reasonable officer in Sergeant Kohler's position would have appreciated any "high degree of risk" in his actions or responses. *Kemp*, 27 F.4th at 496. He cannot be faulted for failing to read Stephenson's mind. *Pulera*, 2019 WL 2476978 at *5. Therefore, the claim against him also fails.

Klotz then followed up with Stephenson again from approximately 11:13 a.m. to 12:00 p.m. on August 20th. (JDPFOF 121.) The only named individual Jail Defendants working that day were Sergeant Kohler and Chief Deputy Bowe. (JDPFOF 143.) Following Klotz's visit, no one from HHS (or anyone else for that matter) indicated in any way to Sergeant Kohler, Chief Deputy Bowe, or any other corrections staff that Stephenson was upset, depressed, suicidal, or in need of any kind of medical or mental health intervention. (JDPFOF 123.) Nevertheless, during the final headcount for the night, at approximately 12:04 a.m. on August 21st, Officer Katrina Rumpff found Stephenson hanging in his cell. (JDPFOF 125.)

Binding, materially analogous precedent is clear that these undisputed facts, without more, would not lead a reasonable officer in the Jail Defendants' positions to conclude that there was a serious risk that Stephenson was at a substantial risk of serious harm. *See Wallmow*, 99 F.4th 385; *Jump*, 42 F.4th at 791; *Jutzi-Johnson*, 263 F.3d at 757; *McKinney v. Franklin Cnty., Illinois*, 417 F. Supp. 3d 1125, 1139 (S.D. Ill. 2019); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983); *Estate of Novack*, 226 F.3d 525; *Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997); *Matos*, 335 F.3d 553; *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1076 (C.D. Ill. 2010); *Collins v. Seeman*, 462 F.3d 757, 760-761 (7th Cir.2006); *Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010). Even "general signs of distress," like crying or expressing sadness—which is not something that any officer ever observed after August 12, 2019—

is not evidence that an inmate is at a substantial risk of harm, because general signs of distress do not point directly at suicidality. *See Wallmow*, 99 F.4th at 391; *see also Jump*, 42 F. 4th at 793.

For example, in *Estate of Wallmow v. Oneida County*, a recently arrived pretrial detainee made several concerning statements to his probation agent during her meeting with him at the jail, including saying "demonic things" and that she (the agent) was "talking to a dead man." *Wallmow*, 99 F.4th at 389. Following the meeting, the probation agent called the jail and reported to jail staff that the inmate "was acting oddly, that he had been hitting himself, and that he was having 'demonic' thoughts." *Id.* The jail sergeant then communicated this report to corrections staff by putting it on the shift muster—a log used to pass information from one shift to the next: "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." *Id.*

Two days passed, and corrections staff did not notice anything unusual about the inmate's behavior, let alone anything that was consistent with the probation agent's report. However, by the end of the second day following the agent's report, the inmate committed suicide. *Id.* at 389-90. The Plaintiff argued that staff should have done more, including putting the inmate on suicide watch. But the Seventh Circuit found no liability, noting that the "jail's employees were concerned about Wallmow's behavior, so they took precautions." *Id.* at 393. They did normal rounds and kept an eye on the inmate "without seeing anything amiss. … Tragedy struck in spite of all this, but that fact does not render the precautions constitutionally inadequate" under the Fourteenth Amendment's objective reasonableness standard. *Id.*

Other cases have held that officers lacked the requisite notice of a substantial risk of harm under far more concerning facts than those established by the record in the present case. In *Estate of Novak v. Wood County*, 226 F.3d 525 (7th Cir. 2000), authorities brought the plaintiff to jail and told officers during booking that the plaintiff had been at a mental health facility earlier that day <u>and</u> that he was a potential risk for suicide. *Novak*, 226 F.3d at 530. The plaintiff was also under the care of a psychiatrist, who called the jail the next day and prescribed medication for the plaintiff. Other inmates

told jail officers that the plaintiff was behaving strangely. *Id.* But no jail officer observed or was aware of any suicidal behavior exhibited by the plaintiff. And although the arresting agency told jailers that the plaintiff was a potential suicide risk, these facts lacked indications that the plaintiff's behavior had "a substantial likelihood of taking a suicidal turn." *Id.* Thus, the record was insufficient to show that any officer was on notice of a substantial risk of suicide. *Id.*

In *McKinney v. Franklin County, Illinois*, a juvenile detainee who later committed suicide was upset during intake, cried on several occasions, expressed concerns about his behavioral level, and was in a minor altercation with another detainee. *McKinney*, 417 F.Supp.3d at 1139. Additionally, staff was aware that the detainee was taking psychotropic mediations and had previously undergone mental health evaluations. *Id.* But as a matter of law, this was not enough to put the officers on notice that the detainee was a suicide risk.

In *Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997), the plaintiff was incarcerated in a protective custody tier. During rounds, an officer saw that the plaintiff was mumbling to himself. *Mathis*, 120 F.3d at 89. The plaintiff then told the officer that someone was going to kill him. The officer decided that the inmate should have a psychological evaluation. Shortly thereafter, a paramedic spoke with the plaintiff and the plaintiff said "that he was hearing voices of somebody wanting to kill him or he wanted to kill himself." *Id.* The paramedic requested a psychiatric consultation, at which the plaintiff denied any suicidal impulses. *Id.* at 90. The mental health specialist concluded that the plaintiff was stable and did not need any treatment. *Id.* When the plaintiff was returned to his tier, he remained concerned that someone was going to kill him and called his family expressing this worry. *Id.* Due to the plaintiff's continued concerns, jail staff were directed to keep an eye on the plaintiff. Staff did visual checks of the plaintiff about every 30 minutes, but the plaintiff still ended up committing suicide.

Ultimately, the *Mathis* Court held that even if officers had not been checking on the plaintiff every 30 minutes, "such a finding would not by itself suffice to" overcome summary judgment. *Id.* at 91. Further, even if the mental health specialist had not communicated her conclusions to jail staff, it

was "no matter." *Id.* at 92. And even though the plaintiff's odd behavior continued into the afternoon, there was "no evidence that his behavior changed in a way that made the jail staff aware that he might harm himself." *Id.* As such, the court concluded that there was no constitutional violation. *Id.*

In *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003), the plaintiff-inmate told a correctional officer that he was having trouble coping with the recent deaths of his mother and father and was very emotional. *Matos*, 335 F.3d at 555. He also expressed unhappiness with his transfer to a locked-down wing of the prison and complained of general malaise related to his incarceration. *Id.* at 558. However, he also stated that he did not feel like hurting himself at that time. *Id.* at 555. The court rejected any attempt to impute subjective knowledge of a substantial risk of suicide based on those facts: "not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch," and the fact that the plaintiff was having trouble transitioning into prison life "was neither surprising nor remarkable." *Id.* at 558.

The recent case of *Jump v. Village of Shorewood* is similarly instructive. Jonah Marciniak died by suicide while in jail, and his estate brought an inadequate medical care claim and a failure to protect claim against Cody Smith, the police officer who arrested Marciniak and observed Marciniak in the jail. *Jump*, 42 F.4th at 792. Jump contended that Smith had notice that Marciniak was a suicide risk for the following reasons: Marciniak was naked and intoxicated when Smith arrested him; paramedics at the scene observed that Marciniak was emotionally distressed and recommended that Marciniak go to the hospital; officers arrested Marciniak on the belief that he had just pushed his roommate out of a fourth-floor window during a domestic dispute; Smith believed that Marciniak and his roommate were in an intimate relationship; Marciniak cried, repeatedly asked to see his roommate, and asked if his roommate was okay; Marciniak told Smith that he had past psychiatric treatment; Marciniak was visibly distressed in his cell and slammed his body against the cell bars; and Smith knew that Marciniak overdosed on heroin within the past week. *Id.* at 787, 796–97.

Applying the Fourteenth Amendment's objective unreasonableness standard, the *Jump* Court concluded that Smith had not acted unreasonably by failing to put Marciniak on suicide watch or otherwise take special precautions. It reasoned that the facts known to Smith would not lead a reasonable officer in his position to believe that Marciniak was a suicide risk because, "[m]ost dispositively, we have no facts that Marciniak told Sgt. Smith or [another officer] that he was suicidal." *Id.* at 793–94. Marciniak's distress and his history of psychiatric treatment, without more, did not provide notice that Marciniak was suicidal. *Id.* at 794. Because "Marciniak never gave Sgt. Smith reason to think Marciniak might attempt suicide," it was reasonable for Smith to not take any additional precautions to prevent Marciniak from harming himself. *Id.*

Additional examples abound of courts finding a lack of subjective knowledge even under facts demonstrating far more evidence of strange or questionable behavior, and/or a history of mental health issues. *See, e.g.*, *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1076 (C.D. Ill. 2010); *Collins v. Seeman*, 462 F.3d 757, 760-761 (7th Cir. 2006); *Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983); *Pulera*, 2019 WL 2476978; *Jutzi-Johnson v. U.S.*, 263 F.3d 753, 757 (7th Cir. 2001).

This case is no different. When Stephenson said he was having suicidal thoughts on May 3, 2019, he was put on suicide watch. In the more than three months following his placement on suicide watch, officers occasionally observed Stephenson to have ups and downs, but nothing out of the ordinary. He confirmed at booking that he understood how to request medical care, and he confirmed this understanding by submitting Sick Call Request slips during his incarceration—none of which said he was suicidal. After May 3, 2019, Stephenson never told any of the individual Jail Defendants that he was suicidal or acted in a way that would point directly at suicidality to a reasonable official. But when officers observed Stephenson expressing "borderline suicidal" comments in mid-August, jail staff immediately contacted HHS for a crisis assessment. As a result of that assessment, HHS

confirmed to jail staff that Stephenson was <u>not</u> suicidal <u>and</u> that he agreed to ask to see someone from HHS if that changed.

In the days following August 13th, Stephenson never submitted any kind of request for medical care and did not ask to speak with anyone from HHS any sooner. And no jail staff observed Stephenson saying anything or acting in a way that suggested suicidality. Perhaps most importantly, approximately 12 hours before he committed suicide, Stephenson met with an HHS therapist for 45 minutes. Nothing about his words or demeanor suggested to this trained mental health professional that Stephenson was suicidal or at risk of becoming so. Yet just as in *Wallmow*, tragedy struck in spite of all this. "[B]ut that fact does not render the precautions constitutionally inadequate." *Wallmow*, 99 F.4th at 393.

### 2. The Individual Jail Defendants' Responses Were Objectively Reasonable Based on the Information Known to Them.

In addition to the lack of any evidence of subjective knowledge of suicidality, Plaintiff's claim fails because each of the individual officers responded in an objectively reasonable manner to the information known to them. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (holding that official's response may be reasonable even if it fails to avert the harm)). Particularly without the benefit of hindsight, Stephenson's suicide was totally unexpected. The Jail Defendants had no access to any information that was in Stephenson's HHS or HSU records. Instead, they relied on their own observations and on HHS's crisis assessment reports, and they deferred to trained health care professionals to provide appropriate medical care. They knew that Stephenson had occasional ups and downs, and they even knew that Stephenson crafted a homemade Ouija board and twice drew Satanic symbols on his cell walls and ceiling. They also knew that Stephenson occasionally met with HHS therapists and that HHS never concluded that Stephenson was suicidal or required any heightened monitoring. They knew that Stephenson was "borderline suicidal" in mid-August over a report that his sister was raped, that HHS performed a crisis assessment, and that HHS determined that

Stephenson was not a suicide risk the following day.

Nevertheless, Plaintiff faults the Jail Defendants for failing to put Stephenson on suicide watch despite HHS's assurances that Stephenson was not a suicide risk. But the Fourteenth Amendment "**encourages**" non-medical security and administrative personnel like the Jail Defendants to defer to the judgments and conclusions of trained medical professionals "without fear of liability for doing so." *McGee v. Parsano*, 55 F.th 563, 569 (7th Cir. 2022) (quoting *Berry v Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). There is no evidence that the Jail Defendants' reliance on HHS's conclusions was in any way unreasonable. Even considering Stephenson's apparent interest in Satanic iconography and Ouija boards, this would certainly not indicate a need to put him on a heightened watch status or demand emergency intervention. Because the Jail Defendants' actions were objectively reasonable, they are entitled to summary judgment.

## III. ALTERNATIVELY, THE INDIVIDUAL JAIL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

In the alternative, summary judgment is also appropriate because the Jail Defendants are entitled to qualified immunity. "Government officials performing discretionary functions are immune from suit if their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997). The Seventh Circuit instructs that "[a]lthough the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannola v. Farrow*, 476 F.3d 453, 357 (7th Cir. 2007).

In determining whether the Jail Defendants are entitled to qualified immunity, the trial court conducts a two-step inquiry. First, this Court must determine whether the disputed conduct violated a constitutional right. *Borello*, 446 F.3d at 746. Second, this Court must determine whether the right was "clearly established" at the time of the alleged conduct. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194,

201 (2001)). Whether the law was "clearly established" turns on the "objective legal reasonableness of the action" given the contemporaneous legal rules. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). Thus, a defendant government official is entitled to qualified immunity for unconstitutional conduct so long as there could be a reasonable, albeit mistaken, belief about the legality of his or her conduct. *Saucier*, 533 U.S. at 205-06.

Here, qualified immunity shields the individual Jail Defendants from liability. The inquiry stops at the first prong of the analysis. As discussed above, no jury could find that any of the officers responded in an objectively unreasonable manner to the information known to them. Nevertheless, even assuming that Plaintiff could establish a violation of Stephenson's constitutional rights, these rights were not clearly established at the time of the alleged conduct. "It is insufficient for a plaintiff simply to point out a recognized constitutional right and claim that the right has been violated." *Borello*, 446 F.3d at 750. The Supreme Court instructs that the "clearly established" inquiry "must be undertaken in light of the <u>specific context</u> of the case, not as a broad general proposition." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (emphasis added). The inquiry is narrow and assesses whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 201; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) ("[T]he test for immunity [is] whether the law was clear in relation to the <u>specific facts</u> confronting the public official when he acted." (emphasis added)).

Particularly given the wealth of case law, much of which is described in more detail herein, *supra*, and considering the specific context of this case, no reasonable jail officer would interpret the information known to them to indicate a substantial risk of suicide existed. Similarly, no reasonable jail officer would understand that the actions taken by the Jail Defendants in response to the facts known to them would violate the inmate's constitutional rights. At the very least, reasonable officials in the defendants' positions could disagree on these actions, so it follows that qualified immunity applies. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[I]f [officials] of reasonable competence could

disagree on this issue, immunity should be recognized."). Accordingly, each of the Jail Defendants is entitled to judgment as a matter of law.

## IV.  PLAINTIFF'S *MONELL* CLAIM AGAINST CALUMET COUNTY FAILS AS A MATTER OF LAW.

Plaintiff alleges that Calumet County is liable for violating Stephenson's constitutional rights because it authorized or tolerated 1) a policy, practice, and custom of "detainee medical decisions made irrespective of appropriate medical judgment" that were objectively unreasonable; 2) a policy, practice, and custom of deliberate indifference to "the safety and suffering of detainees with serious medical conditions"; and 3) the routine denial of medical care and access to it. (Dkt. 101, ¶¶ 165-166.) Plaintiff also asserts a failure to adequately train and supervise County employees. (*Id.* ¶ 166.)

### A.  Plaintiff's Claim Based on Policies, Procedures, and Customs Fails.

To succeed on this claim, Plaintiff must show that: a) Calumet County's policies or practices were the moving force behind the alleged constitutional injuries; and b) Calumet County had notice that its policies, or lack thereof, would cause constitutional violations. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978); *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676-678 (7th Cir. 2022). However, even when taken in the light most favorable to Plaintiff, the record establishes that Plaintiff cannot satisfy these elements.

At the outset, the claim fails and must be dismissed because of the lack of any underlying constitutional violation for all of the reasons set forth above, *supra. Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). But even if there was some underlying violation, there is no evidence that any County policy or practice <u>caused</u> any violation. CCJ had multiple policies and practices in place designed to identify inmates at risk of suicide, prevent suicides, and to provide health care for suicidal inmates. (JDPFOF ¶¶ 9, 23.) Additionally, when Stephenson was booked into CCJ, he was provided a "Notice to All Inmates" explaining how to obtain medical care by submitting a completed Sick Call Request. (JDPFOF ¶ 14.) Stephenson signed the Notice confirming his receipt and

understanding of the procedure for obtaining health care at CCJ, and his actions show he understood the process: he submitted Sick Call Requests and received treatment. (JDPFOF 15.)

CCJ's policies and practices explicitly relied on the appropriate medical judgment of trained professionals and ensured that inmates were not denied or delayed access to medical care. Both HHS and ACH were responsible for providing mental health care services to inmates, albeit in different ways. (JDPFOF 24, 27.) If an inmate submitted a Sick Call Request saying that he wanted medication, that request would be routed to the HSU, because ACH was responsible for inmates' prescription medication. (JDPFOF 25.) If the inmate said he just wanted to speak with someone about his mental or emotional health and it was not an emergency, staff would contact HHS to request a nonemergency therapy services assessment. (JDPFOF 87.) If there were concerns that the inmate was suicidal, jail staff would put the inmate on suicide watch and begin logging 15-minute checks. (JDPFOF 26.) Staff would then contact HHS for an emergency mental health crisis assessment. (JDPFOF 28.)

More specifically, in 2019, the services HHS provided to CCJ inmates fell into one of two categories: emergency mental health crisis services under Wisconsin Administrative Code chapter DHS 34, and nonemergency therapy services under Wisconsin Administrative Code chapter DHS 35. (JDPFOF 27.) As it pertains to suicidal inmates, when requested, an HHS crisis worker would perform a face-to-face mental health crisis assessment pursuant to DHS § 34.23 of any inmate. Jail staff did not have to put an inmate on suicide watch in order to request a crisis assessment. (JDPFOF 30.) But once an inmate was on suicide watch, only a crisis worker from HHS could remove the inmate from the watch by performing a mental health crisis assessment and determining that removal was appropriate. (JDPFOF 31.) HHS's crisis workers were all trained and qualified as required by DHS § 34.21 to perform these assessments. (JDPFOF 144.) After the inmate was removed from suicide watch, the HHS crisis worker completed a Mental Health Crisis Log including his or her conclusions and a response plan as set forth in DHS § 34.23(5) and emailed it to the jail sergeant. (JDPFOF 33.) The crisis worker could also follow-up with the inmate one or more times to check on his wellbeing

or progress. *See* DHS § 34.23(6). (JDPFOF 34.) The sergeant then completed the jail's suicide watch log by including a short summary of the crisis worker's conclusions and confirming the inmate's removal from the watch. (JDPFOF 35.) The suicide watch log was then routed to ACH for the inmate's medical file so that ACH staff was aware that the inmate had been on suicide watch. (JDPFOF 36.)

This process was properly followed with Stephenson on both May 6 and August 13, 2019. On May 6, 2019, Klotz performed an emergency mental health crisis assessment at the request of CCJ correctional staff. She determined that Stephenson could be removed from suicide watch and sent her completed Mental Health Crisis Log to Sergeant Kohler. Sergeant Kohler then completed the jail's suicide watch log and forwarded it to ACH. Klotz then followed up with Stephenson on May 14. She also came to see Stephenson on May 20, but he refused to see her. She followed up one more time on May 29. All of these HHS services were under the umbrella of emergency mental health services under DHS Chapter 34. (JDPFOF 65.) Later in August when CCJ staff had concerns that Stephenson might be suicidal, they again contacted HHS. Teska performed a face-to-face emergency mental health crisis assessment on August 13, 2019. She ultimately determined that Stephenson did not need to be put on suicide watch because he was not currently suicidal, and she sent her Mental Health Crisis Log to the jail sergeants and the jail nurse. Then Klotz followed up with Stephenson again on August 15 and 20 pursuant to DHS § 34.23(6).

CCJ also had policies and procedures in place to ensure that inmates received appropriate prescription medication. In their respective roles, ACH and HHS were responsible for all inmate health care decisions, and ACH was responsible for inmates' prescription medication. (JDPFOF 135.) If an inmate brought a prescription with him to jail, if someone dropped off medication for an inmate, or if the inmate said that he was on a specific medication at the time of booking, the booking officer would inform the ACH doctor. (JDPFOF 136.) It was up to the ACH prescriber to verify and then determine whether to continue, discontinue, or modify the prescription. (JDPFOF 137.) Based on

their contract, Calumet County expected ACH to make any and all other determinations and decisions about inmate prescription medication. (JDPFOF 138.)

In this case, Stephenson did not bring any medication with him to CCJ, and no one dropped any medication off. (JDPFOF 5.) At booking, Stephenson told the booking officer that he was not currently on any prescription medication and was not currently taking medication for a mental or emotional condition. (JDPFOF 3.) He did say that he should be taking medication for schizophrenia, but he did not provide any other information, like the name of a prescriber or clinic. This booking information was then routed to ACH. (JDPFOF 7-8.) But because Stephenson did not bring any medications with him, because he said he was not currently on any prescription medication, and because he did not provide any specific information about any type of medication he should be taking, there was no reason to immediately start any kind of medication verification process. Nevertheless, nothing about this process prevented Stephenson from receiving medication. ACH Nurse Roxanne Morris received the booking information on May 6, 2019. (JDPFOF 7.) Using her professional medical judgment, she could have investigated or consulted with the jail doctor if she felt it was warranted.

Additionally, Stephenson could always submit a Sick Call Request to see a nurse about medication—and he did. His May 11th request stated that he had two weeks left of his medication, although it did not say what that medication was. In any event, the request did not allege that he was not receiving medication that he was supposed to take. The slip was forwarded to HSU as required to be reviewed by ACH medical staff so that they could make a decision about how to proceed using their professional medical judgment. And ACH could have determined that medication was appropriate when it conducted Stephenson's full health assessment on July 1st. Calumet County deferred to and relied on ACH to respond and prescribe medication if they believed it was appropriate. Nothing about this policy or practice resulted in a routine denial of medical care or access to it.

Calumet County also provided nonemergency therapy services to inmates if requested. (JDPFOF 27, 139.) If an inmate said she would like to speak with a therapist or counselor about her

mental health, jail staff would refer the inmate to HHS for nonemergency therapy services under Chapter DHS 35, "Outpatient Mental Health." A trained and licensed therapist from HHS would come to the jail to perform a complete mental health assessment according to DHS § 35.17 and determine a diagnosis. (JDPFOF 139.) The therapist would talk to the inmate about services, obtain informed consent, and if the inmate confirmed willingness to continue, the therapist would proceed by completing a treatment plan and providing therapy services. If the therapist believed that the inmate could benefit from psychotropic medication as a result of his or her assessment, and if the inmate was willing, the therapist could also include this in the treatment plan and could make a referral to a psychiatrist employed by HHS for an additional evaluation for medication. (JDPFOF 140.)

Nothing about this policy or practice resulted in medical decisions being made "irrespective of appropriate medical judgment." Nor did these policies and practices result in deliberate indifference to "the safety and suffering of detainees with serious medical conditions." There is absolutely no evidence that any of these policies directly resulted in a denial of medical care for Stephenson, or that his access to proper medical care was in any way limited. Every time Stephenson asked to speak with someone about his mental health, he was able to do so. Every time there was a concern that Stephenson was or might be suicidal, HHS performed an emergency mental health crisis assessment.

Ultimately, even if Plaintiff could show that some Calumet County policy or practice caused a violation of Stephenson's constitutional rights, the claim would still fail because there is no evidence that the County had notice that its policies, or lack thereof, would cause constitutional violations. To satisfy this standard, Plaintiff would need to point to evidence showing that there was a "known or obvious" risk that constitutional violations would occur because of the County's policies or practices. *Polk Cnty.*, 960 F.3d at 380. But Stephenson's suicide on August 20, 2019, was the <u>first ever in the history of Calumet County Jail</u>. (JDPFOF 145.) This is insufficient as a matter of law to demonstrate deliberate indifference. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Thus, there is simply no evidence that the County knew, or even should have known, that any of its policies

or practices would lead to the type of result that occurred here. Accordingly, the County is entitled to summary judgment on Plaintiff's *Monell* claim.

**B.    Plaintiff's Claim Alleging Failure to Train Fails**

As for Plaintiff's claim alleging a failure to train County employees, "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion)) ("[A] policy of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). Thus, a municipality may be liable for its alleged "failure to train" its officers through evidence of "a known pattern of tortious conduct demonstrating the need for additional training, 'rather than a one-time negligen[ce].'" *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (quoting *Bd. of Cnty. Comm. of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407-8 (1997)). Evidence of a pattern is required to show that the municipality "has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm..." *Id.* at 733. And of course, the failure to train must cause the injury. *Tapia v. City of Greenwood*, 965 F.2d 336, 338-9 (7th Cir. 1992).

Additionally, a much narrower theory of *Monell* liability is premised on the concept that there are certain topics or issues that an officer is likely to encounter in the course and scope of his or her employment. Where a municipality chooses not to train its officers whatsoever on these topics or issues, constitutional violations become a "highly predictable consequence" of that choice. *Connick*, 563 U.S. at 63-64. Because the constitutional violation would be an "obvious" consequence of the total failure to train, the Court may infer deliberate indifference <u>without</u> proof of a preexisting pattern of similar violations. *Id.* A "single incident" will do, and so this framework has often been referred to as the "single incident" theory of *Monell* liability.

Here, the "pattern and practice" framework fails due to the lack of any prior similar incidents as set forth above. And the single incident theory necessarily fails because the individual Jail

Defendants and HHS Defendants had completed all training required by the Wisconsin Law Enforcement Standards Board as of August 20, 2019. (JDPFOF 141.) In Wisconsin, training of jail officers is governed by state law. The Wisconsin legislature established the Law Enforcement Standards Board to prescribe minimum requirements for jail officer training. *See* Wis. Stat. § 165.85(4)(b). The Board has issued regulations governing jail officer training standards in such areas as maintaining security, supervising inmates, and assisting in healthcare programs. *See* WI Admin. Code Chapter LES § 3.04.

Where a municipality requires its officers to meet the minimum standards of training under state law, there is no deliberate indifference to training needs. *Schnese v. County of Forest*, No. 19-C-1385, 2021 WL 3711035, at *13 (E.D. Wis. 2021) (citing *Tapia*, 965 F.2d at 339 and *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 931 (E.D. Wis. 1999)). Regardless of whether the municipality provided additional or different training above and beyond the state requirements, "compliance by a municipality with such standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference." *Johnson*, 41 F.Supp.2d at 931; *see also Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918-9 (7th Cir. 2003). A plaintiff "cannot avoid summary judgment merely by proving that the injury could have been averted had [defendants] received more or better training." *Ross v. Town of Austin*, No. NA01-0015-C-BG, 2002 WL 31160139, at *8 (S.D. Ind. Sept. 23, 2002), aff'd, 343 F.3d 915.

C.     **Plaintiff's Claim Alleging Inadequate Supervision Fails.**

To establish municipal liability under a theory of inadequate supervision, Plaintiff must identify and demonstrate that a "deliberate action attributable to the municipality itself is the 'moving force'" behind the deprivation of his constitutional rights. *Bryan Cnty.*, 520 U.S. at 399. Plaintiff has not—and cannot—identify any instance or evidence of any deliberate failure to supervise any County employee that had anything to do with the claims he asserts against any County Jail or HHS Defendant.

## V. PLAINTIFF'S ADA AND REHABILITATION ACT CLAIMS AGAINST CALUMET COUNTY FAIL AS A MATTER OF LAW.

In the Seventh Circuit, the ADA and Rehabilitation Act are "functionally identical." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). For the sake of brevity, the County makes the same arguments in support of its defenses to both claims. To state a claim under the ADA and the Rehabilitation Act, an individual must allege that: 1) she is a qualified individual with a disability; 2) she was denied the benefits of the "services, programs or activities of a public entity"; and 3) she was denied those benefits or otherwise discriminated against on account of her disability. *Clemons v. Dart*, 168 F. Supp. 3d. 1060, 1065 (N.D. Ill. 2016). Plaintiff asserts that Stephenson's disabilities were anxiety, depression, bipolar disorder, schizophrenia, and suicidal ideation. (Dkt. 101, ¶ 176.) Plaintiff alleges that Calumet County failed to accommodate and/or discriminated against Stephenson by not placing him on suicide watch, denying him medication requests, failing to adequately monitor him, and denying him adequate mental health treatment. (*Id.*, ¶ 178.)

The Supreme Court has defined "services, programs, or activities" to include recreational, medical, educational, and vocational prison programs. *Pennsylvania Dept. of Corr. v. Yesky*, 524 U.S. 206, 210 (1998); *see also, e.g., Jaros v. Illinois Dept. of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (access to meals and showers on the same basis as other inmates); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (Sunday church services and group substance abuse program constituted "services, programs or activities" for purpose of ADA claim); *Holmes v. Godinez*, 311 F.R.D. 177, 227 (N.D. Ill. 2015) ("[J]ob assignment program constitutes 'services, programs, or activities' under Title II of the ADA."). "It is well established, however, that an inmate's medical treatment, or lack of treatment, does not provide a basis upon which to impose liability under the ADA." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (emphasis added).

"A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities meaningful access to the program or services sought." *Alexander v. Choate*, 469 U.S. 287,

301, 105 S.Ct. 712 (1985). A covered entity has considerable flexibility in deciding how a disability will be accommodated. *Brown v. Meisner*, 81 F.4th 706, 709 (7th Cir. 2023). And, importantly, where the claimed violation involves an alleged failure to accommodate, the ADA's reasonable accommodation requirement "…does not apply unless triggered by a request. This is because a person's disability and concomitant need for accommodation are not always known ... until the person requests an accommodation." *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1087 (C.D. Ill. 2010).

It is Calumet County's position that Plaintiff's claim is, at its core, based solely on complaints about or disagreements with medical care and monitoring for medical concerns. Therefore, it fails and must be dismissed. *Bryant*, 84 F.3d at 249. Nevertheless, to the extent that not placing Stephenson on suicide watch or failing to monitor him could be considered non-medical allegations, Plaintiff's claim still fails. But no court has ever held that inmate monitoring, or decisions about placement on any kind of heightened watch status, fall within the ambit of programs or services covered by the ADA. Rather, they are core penological functions of inmate management required by Wisconsin Administrative Code DOC 350. The Supreme Court recognizes that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). Therefore, courts must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This deference cannot be circumvented by mischaracterizing decisions about inmate safety and management as "programs or services" covered by the ADA.

Moreover, even assuming that monitoring inmates and placement on suicide watch could constitute programs or services under the ADA, there is no evidence that Stephenson's alleged anxiety, depression, bipolar disorder, schizophrenia, or suicidal ideation limited Stephenson's "meaningful

access" to monitoring or suicide watch in any way. It is indisputable that Stephenson was monitored throughout his incarceration and was placed on suicide watch. If Plaintiff is asserting that Stephenson should have received different monitoring or should have been placed on suicide watch more often, this argument goes too far: no authority has ever held that someone with Stephenson's alleged disabilities is entitled to placement on suicide watch or heightened monitoring as a "reasonable accommodation" under the ADA. The ADA requires only <u>reasonable</u> accommodations. It does not compel a covered entity to provide a person with the accommodation of his choosing. *See Olmstead v. Zimring*, 527 U.S. 581, 602-3 (1999). In any event, neither Stephenson nor anyone else ever requested any change in the way Stephenson was monitored by CCJ staff, and there is no evidence that Stephenson asked to be put on suicide watch but was denied—let alone that any such denial was on account of any disability. Therefore, the claim fails. *See Wells*, 723 F. Supp. 2d at 1087.

Finally, Plaintiff mentions an alleged rule that prevents inmates "from reporting health or suicide concerns in writing to correctional staff on weekends or holidays or on any weekday after 8:00 a.m." (Dkt. 101, ¶ 180.) But no such policy or rule existed, period. It appears that Plaintiff has confused Inmate Communication Forms with Sick Call Requests, which are two different types of requests as spelled out in the Inmate Handbook and the Notice to All Inmates given to inmates at booking. ICFs were used to communicate about anything from needing more toothpaste, to complaining about another inmate, to asking for a phone call. (JDPFOF 17.) They were not to be used to communicate medical needs or requests. According to the Inmate Handbook, ICF forms could be requested and collected during weekday breakfast service. Medical or mental health requests were submitted on Sick Call Requests, which were not subject to those rules or procedures. (JDPFOF 14.) Thus, Plaintiff's claim lacks any factual basis and must be dismissed.

## **CONCLUSION**

Based on the foregoing, Defendants Calumet County, Kurt Kohler, Elizabeth Zahrobsky, Julie Hoerning, and Brett Bowe respectfully request that this Court grant their Motion for Summary Judgment and dismiss Plaintiff's claims in their entirety, with prejudice and costs.

Dated this 21st day of June, 2024.

<div style="margin-left: 40%;">

BY:    s/ Sara C. Mills
       SAMUEL C. HALL, JR.
       State Bar No. 1045476
       SARA C. MILLS
       State Bar No. 1029470
       CRIVELLO, NICHOLS & HALL, S.C.
       Attorneys for Defendants Calumet County, Kurt Kohler, Elizabeth Zahrobsky, Julie Hoerning, and Brett Bowe
       710 N. Plankinton Avenue, Suite 500
       Milwaukee, WI 53203
       Phone: 414-271-7722
       Fax:     414-271-4438
       Email: SHall@CrivelloLaw.com
             SMills@CrivelloLaw.com
             KZellner@CrivelloLaw.com

</div>