UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF DEMETRIUS L. STEPHENSON,
*By Special Administrator Richard Coad*,

    Plaintiff,

  v.              Case No. 22-C-956

CALUMET COUNTY, et al.,

    Defendants.

## DECISION AND ORDER

In the evening hours of May 2, 2019, Demetrius L. Stephenson was arrested for theft of movable property and operating a motor vehicle without owner's consent. He was booked into the Calumet County Jail that night, and because he was unable to post the cash bail imposed by the court at his initial appearance, remained in custody. Over the course of the following four months, Stephenson reported he was feeling sad, depressed, and at times, suicidal. On August 22, 2019, at 12:04 a.m., a corrections officer found Stephenson hanging by his bedsheet in his cell. Stephenson was later pronounced dead at a local hospital.

Stephenson's Estate brought this action under 42 U.S.C. § 1983, alleging that Calumet County Sheriff Brett Bowe, various jail officers, and members of the medical and mental health staff who provided care to jail inmates, acted in violation of Stephenson's Fourteenth Amendment rights in their failure to take steps to prevent his suicide. Plaintiff also alleges that Calumet County itself, Advanced Correctional Healthcare (ACH), the company the County hired to provide medical care to jail inmates, and USA Medical and Psychological Staffing S.C., the company that provided the medical staff to service the contract, maintained unconstitutional policies and

practices in violation of the Fourteenth Amendment. In addition to its § 1983 claims, Plaintiff brought claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12111–213, and the Rehabilitation Act, 29 U.S.C. §§ 794–94e, and a state law claim for indemnification. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

The case is presently before the court on Defendants' motions for summary judgment and Plaintiff's cross motion for partial summary judgment. As a preliminary matter, Plaintiff does not oppose dismissal of its Americans with Disabilities Act claim, Rehabilitation Act claim, and claim against Sheriff Bowe. Dkt. No. 208 at 1. The court will therefore dismiss these claims without further discussion and proceed to the facts of the case.

## BACKGROUND

The following factual account summarizes Stephenson's time at the Calumet County Jail. Additional facts will be recounted as necessary.

Stephenson was booked into the Calumet County Jail at approximately 10:20 p.m. on May 2, 2019. Dkt. No. 169-5. As part of the booking process, Corrections Officer Dalia Dedering asked Stephenson a series of medical and mental health screening questions. Dkt. No. 169-6. Stephenson stated he was not currently taking or prescribed any medications for mental or physical health, but indicated he should be taking medication for schizophrenia. *Id.* at 2. Stephenson further indicated that he thought of hurting or killing himself "a lot but mainly self-cuts." He stated that he felt depressed "due to life circumstances and upbringing," but denied he had "a mental health or emotional condition" that he needed help with while in jail. He indicated he was not currently seeing a doctor or mental health professional for a mental or emotional problems but admitted that he had attempted to commit suicide by overdose months prior to his arrest. He recalled nothing about the suicide attempt other than waking up in the hospital. *Id.*

2

Officer Dedering noted no bizarre or unusual behavior suggesting the probability of mental illness or risk of suicide. At the time of booking, Stephenson was not threatening or talking about suicide or death, nor did he appear withdrawn, nervous, anxious, or upset. Officer Dedering noted the crimes he was held on were not shocking in nature and Stephenson did not hold a position of respect such that his arrest would prove a devastating blow to his reputation or image. Upon concluding that Stephenson's behavior did not represent a high risk of suicide, Officer Dedering recommended standard mental health watch with regular checks. *Id.* at 3. After booking, Stephenson was assigned to a single occupancy cell in C block. Dkt. No. 195 ¶ 18.

On May 3, 2019, Stephenson asked for help with suicidal thoughts. *Id.* ¶ 19. Stephenson met with Sergeant Hoerning in the booking room and explained to her that a "voice was telling him to cut his wrists" and that "he wanted to go to sleep and never wake up." *Id.* ¶ 21. Stephenson told Hoerning that he would like to speak to someone about these thoughts, so Hoerning set up a call with Calumet County Health and Human Services Department (HHS) crisis worker, Nicole Smith. *Id.* ¶¶ 22, 41. Stephenson spoke with Smith over the phone for about 20 minutes at which point he hung up the phone and began crying. *Id.* ¶ 44. Hoerning, after observing the phone call and aftermath, placed Stephenson on suicide watch. *Id.* ¶ 43, 46. Consequently, Stephenson was placed in a suicide smock and moved to an observation cell where officers were to check on him every 15 minutes.

On May 6, 2019, HHS therapist Kristin Klotz met with Stephenson face-to-face in a private conference room. Dkt. No. 196 ¶ 51. Stephenson reiterated that on May 3, 2019, he saw a demon that told him to kill himself, but he indicated to Klotz that he was no longer seeing that demon. *Id.* ¶ 57; Dkt. No. 195 ¶ 55. Klotz knew at the time that Stephenson was not on any psychotropic medication, and he told Klotz that he did not want to take any medication. Dkt. No. 164 ¶ 26.

3

Based on Klotz' professional judgment and Stephenson's denial of "any suicidal ideation, intent or plan to commit suicide or self-harm," Klotz removed Stephenson from suicide watch. Dkt. No. 196 ¶¶ 61, 63.

On May 14, 2019, Klotz met with Stephenson again for a scheduled follow up assessment. *Id.* ¶ 64. Stephenson indicated his suicidal ideation "comes and goes." He made vague references to not being here "much longer," but he denied any specific plan or intent to harm himself at that time. Stephenson expressed anger at his situation, worry that his siblings would be placed in foster care, and a desire to be home with his family. Klotz attempted to "validate his feelings," "provide support and encouragement," and remind him "of things that are within his control." Klotz also informed Stephenson that he could receive ongoing therapy services while he was in jail. Stephenson initially stated he was not interested in ongoing services but after some time stated he might be open to it. Klotz told Stephenson that HHS therapists had "emergency availability," but Stephenson said he did not like talking to a lot of different people. She then informed him that she could help people learn coping and relaxation skills that could be utilized in the jail, including exercise, deep breathing, or pursuing a hobby like making music. Stephenson told Klotz that he sometimes had panic attacks and had been previously diagnosed with Bipolar, Schizophrenia, and Anxiety. Stephenson indicated he had previously taken medication but could not recall the name of it and expressed ambivalence about taking medication while in jail. Though he later admitted he did better with medication, Stephenson said he did not want to take any "new medication." In summary, Klotz noted that Stephenson had calmed down after talking with her, began to make minimal eye contact, was able to carry on goal-directed conversation, and was future-oriented. She planned to arrange a meeting again the following week. Dkt. No. 138-1 at 3.

4

On May 20, 2019, Klotz returned to the jail to meet with Stephenson for a scheduled follow up, but Stephenson refused to come out of his cell as it was "too early in the morning" for him. Dkt. Nos. 196 ¶ 69; 179-20. On May 29, 2019, Klotz met with Stephenson for a scheduled follow up where he indicated he was "feeling calmer" and "less depressed," and "denie[d] any suicidal ideation, intent or plan." Dkt. Nos. 196 ¶ 70; 138-1 at 5. Stephenson stated he would like to see Klotz on a regular basis. Because Stephenson was still a minor and it was unclear who his guardian was, Klotz met with her supervisor, Kristi LeClair, the following day to discuss how to proceed. LeClair stated she would look into it further but instructed Klotz to see Stephenson for "short-term services on an as-needed basis while he remains incarcerated in Calumet County Jail." On July 2, 2019, Klotz emailed the jail inquiring how Stephenson was doing, noting she hadn't received any requests to see him for some time. Sergeant Hoerning responded that Stephenson was "very up and down." Klotz replied by requesting that Hoerning let her know "if he (or you) would like me to come down to see him." Dkt. No. 138-1 at 6–7.

In the meantime, on June 13, 2019, jail staff discovered a make-shift Ouija board in Stephenson's cell and satanic drawings in pencil on the ceiling above his bunk, including the number "666", satanic crosses, and other references. The cell was also found to be dirty with wrappers all over the floor and the toilet was filled with garbage. Several disciplinary tickets were issued to Stephenson for the rule violations. Dkt. No. 163-3 at 1–3. Similar satanic drawings were found on the ceiling of Stephenson's cell on August 3, 2019, which resulted in additional disciplinary tickets. Dkt. No. 163-4.

On August 12, 2019, in response to a request from Stephenson and communications from jail staff indicating concerns about Stephenson's suicidality, HHS Supervisor LeClair assigned Shannon Teska, an HHS therapist, to complete a mental health crisis assessment on Stephenson.

5

Dkt. No. 196 ¶ 82. On August 13, 2019, Teska met with Stephenson to conduct a crisis assessment. *Id.* ¶ 83. In this meeting, Teska administered the Columbia Suicide Severity Screening tool and Stephenson told Teska that "he wished he was dead," but that he was not actively suicidal and had "no intentions of harming himself in any way." *Id.* ¶¶ 86–87, 91. Teska concluded that Stephenson did not need to be placed on suicide watch and communicated to LeClair and jail staff that Klotz should meet with Stephenson in two days. *Id.* ¶ 97.

On August 15, 2019, Klotz met with Stephenson for a counseling session. *Id.* ¶ 100. Stephenson denied hearing voices and indicated he did not want psychotropic medication, but he did state that "he would plan to kill himself after his next court date" in September if he was sentenced to return to jail. *Id.* ¶ 103; Dkt. No. 148 at 22. Stephenson, however, gave no specific suicide plan. According to Klotz' note, "His mood was normal/calm, he expresses appropriate affect, and his thoughts appear logical and goal-directed." Klotz "explore[d] and validate[d] his feelings," and challenged the idea that he would want to harm himself, knowing the impact his sister's attempted suicide has on the family. She agreed to meet with Stephenson again in five days. Dkt. No. 138-1 at 9.

On August 20, 2019, Klotz returned to the jail to meet with Stephenson. Dkt. No. 196 ¶ 106. Klotz' progress note states his mood appeared normal/calm, he expressed appropriate affect, and his thoughts appeared logical and goal-directed. He denied any current suicidal ideation, intent, or plan. While Stephenson again stated his intent to kill himself after court if he was not released, he appeared less fixated on that idea. Klotz notes that they talked "quite a bit about plans once he's released including spending time with his family, getting his job back, getting his GED, etc." She noted he was "very future-oriented and looks forward to being with his family. He laughs and jokes with writer throughout the session." They agreed to meet the

following week. Dkt. No. 138-1 at 10. In the early morning hours of August 21, 2019, Stephenson hanged himself using his bedsheets. Dkt No. 196 ¶ 115. Jail staff was unsuccessful in providing life-saving measures. *Id.*

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Fourteenth Amendment Failure to Act

The Plaintiff Estate claims Defendants violated Stephenson's constitutional rights by failing to provide him mental health treatment and protect him from himself, both of which, Plaintiff claims, caused his suicide. The standard governing claims for failing to provide a prison inmate adequate medical care or for failure to protect a prison inmate from other inmates, including the inmate himself, is "deliberate indifference" to serious medical needs or risk of harm under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). At all times relevant to this action, however, Stephenson was not a prison inmate; he was a pretrial detainee. A pretrial detainee is a person who is being held in custody at the jail awaiting trial or other disposition of the charges against him. As such, Stephenson was entitled to the protection of the Fourteenth Amendment, as opposed to the Eighth Amendment's prohibition of cruel and unusual punishment which applies only after a person is convicted of a crime. *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017). Because a pretrial detainee has not been convicted of any crime, he is entitled to the constitutional presumption of innocence and cannot be punished at all simply because of his status. *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979). The Eighth Amendment's prohibition of "cruel and unusual" punishment is therefore not applicable. Instead, a pretrial detainee's constitutional right to medical care and protection from self-harm emanates from the Fourteenth Amendment's Due Process clause. *Collins*, 851 F.3d at 731.

Until relatively recently, courts applied the same standard to such claims by pretrial detainees as they applied to convicted prisoners. *See, e.g.*, *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010) ("Although the Eighth Amendment applies only to convicted persons, pretrial detainees like [the plaintiff] are entitled to the same basic protections under the Fourteenth

8

Amendment's due process clause. Accordingly, we apply the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment.").  That is no longer the case.

In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which involved an excessive force claim brought by a pretrial detainee, the Supreme Court drew a distinction between the two state-of-mind questions that arise in such cases, which the Court then fashioned into the two-pronged test for a Fourteenth Amendment violation:

> In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts— i.e., his state of mind with respect to the bringing about of certain physical consequences in the world.  The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive."  Here, as to the first question, there is no dispute.  As to the second, whether to interpret the defendant's physical acts in the world as involving force that was "excessive," there is a dispute. We conclude with respect to that question that the relevant standard is objective not subjective.  Thus, the defendant's state of mind is not a matter that a plaintiff is required to prove.

*Id.* at 395.

The Court proceeded to hold that for the required state of mind attending the physical acts (the first prong), "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind."  *Id.* at 396.  "That is because," the Court explained, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).  The Court then provided examples of situations where the required state of mind would not be present in the kind of excessive force case before it: "Thus, if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim. But if the use of force is deliberate—*i.e.*, purposeful or knowing—the pretrial detainee's claim may proceed."  *Id.*

As for the second question—whether the force purposefully used was excessive—the Court held that the standard was "objective reasonableness." *Id.* at 396–97. Instead of asking whether the force used was clearly more than reasonable under the circumstances and, therefore likely intended as punishment, the Court focused narrowly on the question whether the force used was objectively excessive. In doing so, the Court rejected the argument that the plaintiff was required to prove that the officer had "an actual intent to violate the plaintiff's rights or acted in reckless disregard of those rights." *Id.* at 394 (cleaned up). In other words, a pretrial detainee in an excessive force case need only show that the force purposefully or knowingly used by the officer was objectively unreasonable. The plaintiff is not required to show that the officer used more force than he was justified in using under the circumstances with the intent to impose punishment upon the pretrial detainee. *Id.* at 396–97.

While *Kingsley*'s "objective reasonableness" test offers conceptual challenges even in excessive force cases, it has proved especially difficult to apply in what were previously known as Fourteenth Amendment deliberate indifference cases. In *Miranda v. County of Lake*, the Seventh Circuit incorporated the *Kingsley* test for excessive force cases into the standard for deliberate indifference cases or, what might more accurately now be called, failure to act cases. 900 F.3d 335, 352–54 (7th Cir. 2018). Applying that standard to a claim for failure to act on the part of the defendant medical staff to provided care, *Miranda* concluded that a jury would be asked two questions: (1) "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case;" and (2) whether the defendants' actions were "objectively reasonable." *Id.* at 353–54.

Like *Kingsley*, *Miranda* also provided examples of situations in which the required state of mind for the first prong would not be met in a Fourteenth Amendment failure to act claim. The

court noted that the medical defendants would not have acted purposefully or knowingly "if, for example, [they] had forgotten that [the plaintiff] was in the jail, or mixed up her chart with that of another detainee, or if [a medical defendant] forgot to take over coverage for [another health care provider] when he went on vacation." 900 F.3d at 354. "Such negligence," the court explained, "would be insufficient to support liability under the Fourteenth Amendment, even though it might support state-law liability." *Id.* If the failure to act was not due to such a mistake, however, the sole question would be whether the failure to act was "objectively unreasonable." *Id.*

The difficulty of applying *Kingsley*, however, whether in excessive force or in failure to act cases, is that it seems to conflate the standard for constitutional claims with that governing common law negligence claims, notwithstanding the Court's repeated insistence that negligence is not enough to establish a constitutional violation under § 1983. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."). To see why this is so, it is helpful to review the Court's decisions establishing liability based on the deliberate indifference standard under the Eighth Amendment.

The Court first announced the deliberate indifference standard in *Estelle v. Gamble*, where it held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (cleaned up). In *Farmer v. Brennan*, the Court sought to clarify the standard of deliberate indifference in the context of a claim for failure to protect an inmate from physical attacks by other inmates. 511 U.S. 825 (1994). "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other," the Court noted, "the Courts of Appeals have routinely equated deliberate indifference with recklessness."

*Id.* at 836 (collecting cases). The Court agreed that "[i]t is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* But to say that the failure to act amounted to recklessness, the Court observed, did not answer the question "about the level of culpability deliberate indifference entails." *Id.* In answering that question, the Court rejected the "petitioner's invitation to adopt an objective test for deliberate indifference." *Id.* at 837. The Court held instead that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Of course, in both *Estelle* and *Farmer*, the Court was addressing the standard under the Eighth Amendment, not the Fourteenth, but what both Amendments have in common when applied to persons held in custody is that they both forbid punishment. The Eighth Amendment forbids the infliction of "cruel and unusual" punishment on persons convicted of a crime, and the Fourteenth Amendment forbids the infliction of any punishment whatsoever inflicted on pretrial detainees. The distinction the Court drew in *Farmer* between excessive force claims and failure to act claims, as well as its reason for rejecting an objective test for deliberate indifference claims, highlight the conceptual difficulty in incorporating *Kingsley*'s "objective reasonableness" standard into the Fourteenth Amendment standard for claims by pretrial detainees.

In rejecting the petitioner's invitation to adopt an objective test for deliberate indifference in *Farmer*, the Court acknowledged that "[a]n act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation." *Id.* at 837–38. The Court noted that "[t]he

12

common law reflects such concerns when it imposes tort liability on a purely objective basis." *Id.* at 838 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS §§ 2, 34, pp. 6, 213–14 (5th ed. 1984); Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680; *United States v. Muniz*, 374 U.S. 150 (1963)). But that was not the standard the Court adopted for determining constitutional violations.

The Court explained that it declined to impose liability in the absence of "knowledge of a significant risk of harm" under the Eighth Amendment because that Amendment prohibits "cruel and unusual *punishment*," not cruel and unusual conditions that are unknown to the officers: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," the Court explained, "cannot under our cases be condemned as the infliction of punishment." *Id.* Punishment, in plain English, means "the infliction of a penalty or sanction as retribution for an offense or transgression." Punishment, *Oxford English Dictionary*, https://www.oed.com/dictionary/punishment_n (last visited on November 8, 2024). Absent an officer's knowledge that his failure to act would likely result in harm to the inmate, the officer cannot be said to be inflicting punishment on the inmate, whether cruel and unusual or not. At least, this is the conclusion the Court has reached when defining "punishment" under the Eighth Amendment.

Ultimately, the Court concluded its rejection of an entirely objective test for deliberative indifference was necessary to avoid reducing constitutional violations to common law tort claims for negligent or reckless conduct. All punishment, not just punishment that is cruel and unusual, is prohibited under the Fourteenth Amendment. If punishment, for purposes of the Eighth Amendment, requires the intent to cause harm as retribution, it is not clear why the same is not true for punishment under the Fourteenth Amendment. Thus, the difference between the two

13

Amendments, it would seem, lies in the degree of harm caused, not the intent to cause harm as retribution. The Eighth Amendment prohibits punishment that is cruel and unusual; the Fourteenth prohibits just ordinary punishment. But it is punishment that both Amendments prohibit, not mistaken or poor judgment about what amount of force or kind of medical care is reasonable under the circumstances. *Kingsley*, however, held otherwise and rejected the argument that the officer's intent to use more force than was justified in order to *punish* the inmate was required to establish a Fourteenth Amendment violation. Once it is determined that the use of force was purposeful, the sole question is whether the force used was objectively reasonable.

Since the Seventh Circuit's decision applying *Kingsley* to failure to act claims in *Miranda*, district courts and the Seventh Circuit itself have wrestled with the question of how to define the state of mind element for failure to act claims brought by pre-trial detainees. *See Pittman v. Madison County*, 108 F.4th 561, 566 (7th Cir. 2024) (*Pittman IV*) (affirming district court judgment, despite error in jury instruction, after three appeals and three trials spanning some 16 years, noting that "numerous cases have required us to grapple with the nuances of the state-of-mind requirements in claims brought by pretrial detainees"). *Pittman IV*, the most recent of failure to act cases brought by pretrial detainees that the Seventh Circuit has decided, attempted to definitively clarify the "confusion" and "inconsistency" in the court's case law implementing "*Kingsley*'s standards outside the context of a pretrial detainee's claim of excessive force." *Id.* at 569. There, the court acknowledged that its "observation in *Miranda* that *Kingsley* asks whether a defendant 'acted purposefully, knowingly, *or perhaps even recklessly when they considered the consequences of their handling of [a plaintiff's] case*' . . . reintroduce[ed] what *Kingsley* prohibited: consideration of a defendant's 'intent (or motive) to punish.'" *Id.* at 570–71 (emphasis added) (quoting *Kingsley*, 576 U.S. at 398).

14

After acknowledging this mistake, *Pittman IV* made clear that once a pretrial detainee proves that the defendant officer's failure to act was purposeful and intentional, the sole question is an objective one: did the defendant "take reasonable available measures to abate the risk of serious harm?" *Id.* at 572. As the court emphasized, "[t]he objective reasonableness of a decision to deny medical care . . . does not consider the defendant's subjective views about risk of harm and necessity of treatment. Instead, the proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Id.* at 570.

When applying *Kingsley* in failure to act cases, it seems that the first prong of the test will usually be met. Absent of the kind of negligence the court described in *Miranda*, the failure to act will always be considered a deliberate or purposeful choice. It thus appears that the test for the denial of medical care for a pretrial detainee in most cases is likely to come down to whether a reasonable person, in the position of the defendant, would have acted to prevent the harm suffered by the plaintiff. It is difficult to discern how this standard differs from common law negligence. *See, e.g.*, *Dakter v. Cavallino*, 2015 WI 67, ¶ 41. 363 Wis.2d 738, 866 N.W.2d 65 (noting that "the standard of ordinary care is an objective standard; it is the care that would be exercised by a reasonable actor under the circumstances"). Nevertheless, there is no doubt that the standard must differ since the Court has repeatedly stated "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 576 U.S. at 396 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)) (italics original). Though still unclear, courts have provided additional guidance for application of the objectively reasonable standard in the context of jail suicides.

The Supreme Court has cautioned that the objective reasonableness standard cannot be applied "mechanically." *Kingsley*, 576 U.S. at 397. Rather, the court must examine the "facts and circumstances of each particular case" through the lens of a reasonable officer and refrain from invoking the "20/20 vision of hindsight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Among the facts and circumstances that must be taken into consideration is the purpose of a jail. *Est. of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 391 (7th Cir. 2024) ("These include the prevailing penal circumstances at the facility, accounting for the need to 'preserve internal order and discipline and to maintain institutional security.'" (quoting *Kingsley*, 576 U.S. at 397)). People are not placed in county jails so that they can receive medical care or mental health treatment. "Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain." *Bell*, 441 U.S. at 537. That the Constitution requires custodians of pretrial detainees to provide essential medical and/or mental health care for serious conditions that the detainee, because of his detention, cannot obtain on his own does not transform a jail or a prison into a medical clinic or mental health facility required to diagnose and treat any and every ailment with which a detainee may arrive.

It is also important to keep in mind that those detained in county jails awaiting trial or serving prison sentences for crimes are not always on their best behavior. Imposing liability on prison or jail officers and staff can create perverse incentives that can encourage self-destructive behavior by inmates and undermine the ability of correctional institutions to maintain order and security. *See, e.g.*, *Goodvine v. VandeWall*, No. 16-C-890, 2018 WL 460121, at *9 (E.D. Wis. Jan. 17, 2018) ("One can reasonably wonder if Goodvine would continue to persist in such behavior if it did not garner him the kind of attention he has received and fuel his multiple federal cases against correctional staff and administration."); *Bowers v. Pollard*, 602 F. Supp. 2d 977, 933

16

(E.D. Wis. 2009), aff'd 345 F. App'x 191 (7th Cir. Sept. 17, 2009) (noting difficulty prison officials face in trying to protect inmate from himself).

With these considerations in mind, the Seventh Circuit has provided some "key principles for assessing objective reasonableness" in jail suicide cases:

> An express statement that the deceased was not considering suicide from the deceased himself weighs heavily against objective unreasonableness. That conclusion flows from a recognition of on-the-ground circumstances: practically speaking, not every prisoner who shows signs of depression can or should be put on suicide watch. The facts should point directly at suicidality, for a deceased's general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide. For that reason, when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions.

*Est. of Wallmow*, 99 F.4th at 391 (cleaned up).

Additionally, after surviving the two baseline inquires, a plaintiff must show that defendant's objectively unreasonable action caused his injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (citing *Miranda*, 900 F.3d at 347); *Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013) ("[A]n elementary requirement of liability—causation."). Because Section 1983 creates a cause of action for constitutional torts, it must be "read against the background of tort liability." *Whitlock v. Bruggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). As such, causation under § 1983 imitates traditional tort principles and a plaintiff is required to show both "cause-in-fact" and "proximate cause." *Id.* (citing *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008)).

From a common-sense perspective, it may seem strange that a jail employee's or medical staff member's failure to prevent a competent individual's suicide can constitute a cause of that suicide and render the guard or medical staff person civilly liable. As this court noted in *Taylor v. Wausau Underwriters Insurance Co*, "[a] basic principle of causation in tort law is that a

17

superseding cause of the plaintiff's loss relieves the defendant of liability . . . . In the context of a wrongful death action where the death resulted from suicide, 'the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide.'" 423 F. Supp. 2d 882, 898 (E.D. Wis. 2006) (quoting C.T. Drechsler, Annotation, *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 § 4[a] (1950)).  But in *Miranda*, the court noted that "incarcerated persons . . . have been deemed incompetent," and that "jails have a duty 'to prevent the prisoner from giving way' to the 'unusual psychological strain' caused by incarceration.'" 900 F.3d at 349 (quoting *Freeman v. Berge*, 441 F.3d 543, 546–47 (7th Cir. 2006). The idea that incarcerated persons are incompetent by virtue of their incarceration is, of course, a legal fiction.  If a jail inmate assaults a guard or another inmate, there is little doubt he could be lawfully charged with battery by a prisoner.  He would not be deemed incompetent merely because he is a prisoner.  But because the Seventh Circuit has held that prison and jail inmates are deemed incompetent when harming themselves, the argument that Stephenson deliberately took his own life is not a defense to Plaintiff Estate's claim against Defendants.

Plaintiff asserts that certain defendants caused Stephenson's harm even though their alleged constitutional violations were "diluted by intervening days or events."  In support of their argument, Plaintiff cites to *Woodward v. Myers*, No. 99-C-0290, 2001 WL 506863 (N.D. Ill. May 14, 2001).  In that case, the court denied a motion for summary judgment by a defendant intake nurse who failed to notify the shift commander that the deceased inmate had attempted suicide in the past, even though the inmate was to be housed in a medical pod where he would be monitored and receive a mental health evaluation, was seen by both a clinical social worker and the jail psychiatrist, and did not commit suicide until 19 days after the intake was completed.  *Woodward*,

2001 WL 506863, at *8.  In denying the defendant nurse's motion for summary judgment, the

court speculated on what could have occurred as a result of her "deliberate indifference":

> But what if Farver had not waited until October 13, 1998, to hang himself?  What
> if he had hanged himself on September 25, 1998, or on September 26, 1998, or on
> any of the seven days before Mollner got around to seeing Farver?  The fact of the
> matter is that Nurse Dean failed to notify the shift commander as directed by the
> form she filled out during her examination of Farver, she failed to summarize or
> recommend a disposition on that form, and she failed to have that form reviewed
> by her supervisor.  Consequently, Farver was not placed on suicide watch, he was
> not given an immediate mental health screening, and he was not placed on an
> immediate treatment program.

*Id.* at *5.  The court then agreed with the plaintiff "that even though, in retrospect, Nurse Dean's

failures may appear to be diluted by the intervening days or events prior to Farver' suicide, a

reasonable jury could still find that Nurse Dean acted with deliberate indifference to the known or

obvious substantial risk that Farver would take his own life."  *Id.*

The problem with this analysis is that it ignores the question of causation.  It is not enough

to show that at some point in time, the defendant's failure to take additional precautions was

unreasonable.  In order for liability under § 1983 to attach, the plaintiff must also demonstrate that

there is evidence from which a reasonable jury could conclude that the defendant's failure to act

*caused* the harm at issue.  In this case, the harm at issue is Stephenson's suicide.  Unlike the

objectively unreasonable inquiry, causation is necessarily a hindsight inquiry that requires a logical

connection between the action or inaction and the harm.  Where it is undisputed that evaluations

more immediate in time to an inmate's suicide were performed by those with the same or more

expertise, the required causal connection may be lost.  *See, e.g.*, *Novak v. McIlvain*, No. 21-cv-81-

jdp, 2022 WL 7464096, *13 (W.D. Wis. Oct. 13, 2022) (granting summary judgment on claim that

failure to refer for evaluation caused inmate's suicide where evaluation by two mental health

professionals did not prevent suicide and thus no jury could find that another referral would have

made any difference); *Moriarty v. Cnty. of San Diego*, No. 17CV1154-LAB (AGS), 2019 WL 1282002, at *4–5 (S.D. Cal. Mar. 20, 2019) (concluding that defendants' failure to refer inmate for mental health treatment didn't cause his suicide because "[a]ny failure to have him evaluated . . . was corrected when, in the six days following his arrest, he was evaluated twice by a psychiatrist and once by a nurse").

In sum, a plaintiff bringing a failure to act claim under the Fourteenth Amendment must prove (1) the defendant acted purposefully, knowingly, or perhaps even recklessly towards the plaintiff's conditions; (2) the defendant's action (or inaction) was "objectively unreasonable;" and (3) the defendant's objectively unreasonable act caused the plaintiff's harm. In deciding a motion for summary judgment brought by the defendants, the question is whether there is evidence as to each of these elements on which a reasonable jury could find in the plaintiff's favor. It is to that question that the court now turns, beginning with the Calumet County Jail officers.

### 1. **Calumet County Jail Defendants**

Plaintiff alleges the failure of Kurt Kohler, Elizabeth Zahrobsky, and Julie Hoerning's (Jail Defendants) to place Stephenson on suicide watch or confiscate his bed sheets violated Stephenson's constitutional rights. At the time of the events in question, Kohler was a day-shift jail sergeant, Zahrobsky was a jail officer, and Hoerning was a night-shift jail sergeant. The Jail Defendants assert that based on the facts and circumstances known to them at the time of Stephenson's suicide, no reasonable jury could find that their actions were objectively unreasonable. The court agrees with the Jail Defendants.

Jail Defendants argue they are entitled to summary judgment because reasonable officers in their shoes would have acted similarly. *Pittman IV*, 108 F.4th at 572. They rely predominantly on two practical considerations. First, because of the conditions and demands of the jail

environment, "objective reasonableness does not require officers [to] place every inmate showing depression on suicide watch." *Est. of Wallmow*, 99 F.4th at 391. Second, and in tandem with the first consideration, the Fourteenth Amendment not only permits, but encourages non-medical personnel at jails "to defer to the professional medical judgements of physicians and nurses without fear of liability for doing so." *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (cleaned up). "This remains true even when an inmate is in obvious distress and even when the medical staff has misdiagnosed and inmate—or worse, accused him of faking a very real illness." *Id.* at 573 (citing *Miranda*, 900 F.3d at 343). In short, the argument is that because a jail cannot place every inmate who exhibits mental distress and attempted or threatened suicide in the past on suicide watch, Jail Defendants acted reasonably in choosing not to take special precautions for Stephenson based on the information they received from qualified mental health professionals.

Plaintiff attempts to rebut Defendants' argument by claiming that what the Jail Defendants did know was sufficient to trigger action by a reasonable officer and their reliance on medical staff was unreasonable. But Seventh Circuit precedent dictates the opposite conclusion. The court will begin with Hoerning.

### a. Julie Hoerning

The facts viewed in the light most favorable to Plaintiff show that Hoerning knew on May 3, 2019, that Stephenson reported hearing a voice that was telling him to slit his wrists. Hoerning responded by setting up a telephone call with a crisis worker for Stephenson. Dkt. No. 164 ¶¶ 20–21. After Stephenson hung up the phone, Hoerning observed him sit down and cry on a bench. *Id.* In response, jail staff placed Stephenson on suicide watch. *Id.* On May 6, 2019, Stephenson met with Klotz and was taken off suicide watch. *Id.* ¶ 24. Plaintiff does not dispute that Hoerning

21

had no knowledge of the substance of Klotz and Stephenson's conversation, nor why Stephenson was ultimately taken off suicide watch.

Hoerning's next contact with Stephenson was on June 14, 2019, for a disciplinary hearing. Stephenson had drawn satanic-themed graffiti on his cell walls and was in possession of a homemade Ouija board in violation of jail policy. Hoerning took no action in terms of Stephenson's mental health in response to this incident. *Id.* ¶¶ 47–49. On August 3, 2019, Hoerning knew that Stephenson had again drawn satanic-themed graffiti on his cell walls. She took no responsive action. *Id.* ¶¶ 52–54.

On August 12, 2019, Hoerning knew that Stephenson had gotten word that his sister had been raped and he was struggling to cope with this news, that he had made statements about hanging himself, and that he had stated on an Inmate Communication Form, "Please I need to talk with [indecipherable] or someone because my depression is going to be the end of me." Hoerning also knew that other jail officers considered Stephenson "borderline suicidal." In response, Hoerning contacted HHS staff, but she did not place Stephenson on suicide watch or take other precautionary measures. *Id.* ¶¶ 55–58. The next day, August 13, 2019, HHS therapist Teska met with Stephenson and sent her assessment report to Hoerning which concluded that Teska did not believe Stephenson was an imminent risk of suicide. *Id.* ¶¶ 66, 68. This is the extent of Hoerning's knowledge and response as she took a preplanned vacation on August 16, 2019, roughly four days prior to Stephenson's suicide.

No reasonable jury could conclude that Hoerning's actions were objectively unreasonable. Regardless of Hoerning's subjective beliefs, she exhibited a pattern of deferring to professional medical judgment, which is exactly what the law empowers her to do. *McGee*, 55 F.4th at 569. Plaintiff argues that reliance on medical judgment cannot justify Hoerning's nonaction on August

12, 2019, because Hoerning had knowledge of Stephenson's suicidal ideation. But Hoerning contacted HSS and Teska thereafter assessed Stephenson and determined he was not an imminent suicide risk.

Plaintiff's argument does not create a triable issue of fact for several reasons. First, general suicidal ideation is not synonymous to alerting a reasonable jail officer of the "substantial and imminent risk of suicide." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006); *see also Jump v. Vill. of Shorewood*, 42 F.4th 782, 793–94 (7th Cir. 2022); *Pulera*, 966 F.3d at 554–55; *Estate of Rivett v. Waukesha Cnty.*, No. 21-cv-0972, 2023 WL 3467502, at *4 (E.D. Wis. May 15, 2023). Nothing Hoerning learned on August 12, 2019, would have prompted a reasonable officer in her position to recognize a substantial risk and do more. Supporting this conclusion, most dispositively, is that Stephenson never told Hoerning directly or indirectly that he was imminently suicidal. *Est. of Wallmow*, 99 F.4th at 391; *Jump*, 42 F.4th at 793–94. Even in the face of new information, Hoerning, as a reasonable officer would have, relied on her prior knowledge that professional medical staff did not consider Stephenson to be suicidal.

Plaintiff challenges the reasonableness of Hoerning's reliance on prior medical advice. While Plaintiff is correct in asserting that a jail official cannot defer to professional medical advice when the jail official "had reason to know that the medical staff was failing to treat or inadequately treating an inmate," *McGee*, at 569 (cleaned up) (quoting *Miranda*, 900 F.3d at 343), Hoerning had no reason to believe that the HSS staff was not doing their job. Stephenson was the first inmate ever to commit suicide at Calumet County Jail.

Moreover, contrary to Plaintiff's suggestion, "[s]uicide watch is not a benign designation." *Maxwell v. Outagamie Cnty. Jail*, 20-CV-386, 2022 WL 17300881, *11 (E.D. Wis. Nov. 29,

2022). Although the specifics vary, placing an inmate on suicide watch generally involves significant restrictions on the inmate and increase demands on jail staff:

> An inmate on suicide watch is segregated from the rest of the jail population and placed in a cell alone. All of his clothing is taken away and he is given only a heavy-duty smock to wear. He is given only a specialized "suicide blanket." He is deprived of any personal property. A camera is on him all the time, and an officer checks on him every 15 minutes. Even his meals are different: he is given only "safety meals."

*Id.* (record citations omitted). For this reason, suicide watch is reasonably reserved for situations where "no lesser means can reasonably protect the inmate," *id.*, and is generally limited to a few days.

It is also true that jail inmates regularly have suicidal risk factors akin to Stephenson's, and "not every prisoner who shows signs of depression can or should be put on suicide watch." *Est. of Wallmow*, 99 F.4th at 391 (quoting *Pulera*, 966 F.3d at 551). Moreover, the fact that an inmate says he feels suicidal on one day does not mean he must be placed on suicide watch for the remainder of his stay in jail. Thus, it was objectively reasonable for Hoerning to contact HSS rather than immediately place Stephenson on suicide watch.

It is also important to note that objective reasonableness by its very nature does not demand a particular response. *See Hammer v. Schwart-Oscar*, No. 21-1718, 2022 WL 2828280, at *2 (7th Cir. July 20, 2022) (concluding, under the closely related deliberate indifference standard, that incrementally more aggressive responses over time, as opposed to the most aggressive response immediately, can be reasonable); *see also Maxwell*, 2022 WL 17300881, at *11 ("[L]esser interventions may be imperfect, but the Fourteenth Amendment requires only reasonableness.). Here, Hoerning may not have immediately put Stephenson on suicide watch, but the facts indicate she did take remedial measures by emailing HHS to schedule a crisis assessment for the next day. *See Est. of Wallmow*, 99 F.4th at 393 (finding jail officers were not objectively unreasonable in

24

forging immediate remedial action even with knowledge that the decedent required special attention).  In fact, the remedial measure Hoerning took was the exact measure Stepheson requested—speaking to someone about his depression.  It is illogical to conclude that an officer who takes the action requested by a mentally competent detainee can then be held to have been objectively unreasonable.  *Jump*, 42 F.4th at 793–94 (confirming that detainees explicit communications are most dispositive).

Plaintiff cites to *Belbachir v. County of McHenry* in support of its argument that Hoerning and the other Jail Defendants were objectively unreasonable in foregoing "simple and obvious precaution[s]."  726 F.3d at 982.  But the facts of *Belbachir* are clearly distinguishable.  In *Belbachir*, a clinical social worker who saw the deceased three days before her suicide diagnosed the deceased as "suicidal and suffering from a major depressive disorder," yet failed to place her on a suicide watch.  *Id.* at 981.  In this case, in contrast, Hoerning placed Stephenson on suicide watch on May 3, 2019, when he appeared suicidal and contacted HSS to evaluate him on August 12, 2017, when similar concerns arose.  Even if the court were to conclude that Hoerning's decision to not place Stephenson on suicide watch on August 12, 2017, or take his bedding was objectively unreasonable, that decision was not the cause of Stephenson's suicide.  *Pulera*, 966 F.3d at 550 (citing *Miranda*, 900 F.3d at 347); *Belbachir*, 726 F.3d at 982.  If Stephenson had been placed on suicide watch on August 12, 2019, jail staff would have removed him from suicide watch on August 13, 2019, after Teska communicated her professional opinion that Stephenson was not an imminent risk of harming himself.  For these reasons, Plaintiff's individual claim against Hoerning fails as a matter of law.

### b. Elizabeth Zahrobsky

Zahrobsky's knowledge of Stephenson was more attenuated than Hoerning's. Viewed in the light most favorable to Plaintiff, the facts establish that Zahrobsky knew Stephenson was placed on suicide watch in early May 2019, though she did not know why. On June 13, 2019, Zahrobsky discovered the satanic graffiti and homemade Ouija board in Stephenson's cell, but Stephenson did not indicate he was suicidal during that interaction. Dkt. No. 164 ¶ 47. On June 19, 2019, Zahrobsky knew Stephenson seemed to be upset, but after inquiry, Stephenson said he was alright and did not want to speak to anyone. Dkt. No. 195 ¶¶ 85–88. Finally, on August 3, 2019, Zahrobsky knew Stephenson had again defaced his cell with satanic-themed graffiti, but that Stephenson was not hallucinating or suicidal. Dkt. No. 164 ¶ 52. Beyond reporting these incidents and encounters through inter-jail communication channels, Zahrobsky did not take any remedial action concerning Stephenson. Absent any signs that Stephenson was suicidal or not in control of his faculties, her failure to take additional action beyond charging him with rule infractions was objectively reasonable.

Most dispositively, "an express statement that the deceased was not considering suicide from the deceased himself weighs heavily against objective unreasonableness." *Est. of Wallmow*, 99 F.4th at 391 (cleaned up) (quoting *Pulera*, 966 F.3d at 551). It is undisputed that Stephenson affirmatively stated to Zahrobsky that he was alright on June 19, 2019. As far as the satanic-themed graffiti and the homemade Ouija board, strange behavior alone is not enough and "facts should point directly at suicidality." *Id.* at 391; *see also Sanville v. McCaughtry*, 266 F.3d 724, 738 (7th Cir. 2001). Defacement of jail cells is commonplace. And while not commonplace, a significant body of caselaw exists concerning Satanism in jails. *See generally, e.g.*, *Childs v. Duckworth*, 705 F.2d 915 (7th Cir. 1983); *McCorkle v. Johnson*, 881 F.2d 993 (11th Cir. 1989).

26

Stephenson's cell defacement and homemade contraband, therefore, do not point directly to suicidality.  Finally, as with Hoerning, Teska's opinion that Stephenson was not suicidal severs causation.  For these reasons, Plaintiff's individual claim against Zahrobsky fails as a matter of law.

### c. Kurt Kohler

Last, the court considers Defendant Kohler.  Kohler's interaction with Stephenson began on May 6, 2019, when Kohler received Klotz' Mental Health Crisis Log.  Dkt. No. 195 ¶ 57.  That log read, "[Stephenson] denies any current suicidal ideation, intent, or plan.  He can be removed from suicide watch at this time.  He hopes to return home after court with his foster mom.  If he is not released following court, he may need to be reassessed at that time." *Id.*  In addition, based on the crisis log, Kohler knew Stephenson said he had seen a demon that told him to kill himself. *Id.* ¶ 58.  In response to Klotz' directions, Kohler removed Stephenson from suicide watch. *Id.* ¶ 59.

Kohler was not appraised of any of Stephenson's treatment until August 13, 2019, when he received Teska's crisis assessment. *Id.* ¶ 109; Dkt. No. 141-1.  Based on the assessment, Kohler knew that Stephenson was depressed because his sister had been raped and he was having a hard time coping with that news, that Stephenson had stated his depression was going to be the end of him, that Stephenson had made statements about hanging himself before Teska saw him, that Stephenson had attempted suicide in the past, but that Teska concluded Stephenson was not actively suicidal at the time. *See* Dkt. No. 141-1.

Plaintiff asserts that between August 13, 2019, and August 21, 2019, Kohler "rebuffed" LeClair and Klotz' suggestion to place Stephenson on suicide watch and "misled them" as to Stephenson's confinement in a single occupancy cell.  Dkt. No. 208 at 23 (citing Dkt. No. 196 ¶ 118).  The evidence cited, however, does not support the assertion made.  To the extent any

evidence concerning what Klotz was told exists, it appears to be inadmissible hearsay evidence that the court cannot consider at summary judgment. Fed. R. Civ. Pro. 56(c), (e); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 744 (7th Cir. 1997) (citations omitted) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). The evidence Plaintiff apparently relies on is deposition testimony of LeClair in which she asserts, with limited certainty, that she believes Klotz spoke on the phone with Kohler, and Kohler indicated that Stephenson was in a multi-occupancy cell. Dkt. No. 146 at 26. In her deposition, Klotz did not recall the details of the conversation, only that one took place. Dkt. No. 148 at 24. This is not evidence upon which a reasonable factfinder could rely to impose liability on Kohler. It thus follows that because Kohler's only responsive actions were directly in line with the advice of qualified mental health professionals, Plaintiff's individual claim against him fails as a matter of law.

The Jail Defendants also assert qualified immunity. Because the court is granting summary judgment on the merits, it need not consider Jail Defendants' qualified immunity arguments.

**2. HHS Therapists**

Plaintiff also alleges the nonaction of Shannon Teska, Kristin Klotz, and Krisi LeClair (HHS Therapists) was objectively unreasonable in violation of Stephenson's constitutional rights. The HHS Therapists argue that no reasonable jury could conclude they were objectively unreasonable in responding to Stephenson's possible risk of suicide. The court concludes there are triable issues of fact concerning whether the failures to act of Klotz, Teska, and LeClair were objectively unreasonable. The court will address Defendant Klotz first.

### a. Kristin Klotz

Of the HHS Defendants, Klotz had the most interaction with Stephenson. Klotz, a behavioral health therapist, first met with Stephenson on May 6, 2019, to determine if he needed to remain on suicide watch. Dkt. No. 164 ¶ 24. Klotz indicated she would have read Smith's phone call evaluation, and thus, Klotz knew that Stephenson was crying during the call, that he was hearing a voice telling him to kill himself, that he claimed to be diagnosed with bipolar, ADHD, and anxiety, and that he had acted on suicidal ideation months before being detained. Dkt. No. 164 ¶¶ 24–33. During the May 6, 2019 meeting, Klotz learned that Stephenson had previously planned to hurt himself with a comb in prison but was no longer planning to do so, that he was not taking psychotropic medication nor did he want to, that he was paranoid about planes and dogs, and that he had reported a demon told him to kill himself but he no longer saw or heard that demon. *Id.* In response, Klotz advised jail officials that Stephenson could be removed from suicide watch as he denied current suicidal ideation, intent, or plan. Klotz did not seek to have Stephenson seen for formal diagnosis. *Id.* ¶ 30.

On May 14, 2019, Klotz returned to the jail for a follow up visit with Stephenson. *Id.* ¶ 31. During that meeting, Stephenson told Klotz that his suicidal ideation "comes and goes," but he denied any plan or intent to harm himself. *Id.* ¶ 32. Stephenson further indicated he had past mental health diagnoses (this time, Bipolar, Schizophrenia, and Anxiety), and that he wished to continue seeing Klotz on a regular basis. *Id.* ¶ 33. Klotz also learned that Stephenson had been taking medication but did not know what kind, and that he did not want to start any medications that were new to him. *Id.* ¶ 35. On May 20, 2019, Klotz attempted to meet with Stephenson, but Stephenson did not want to. *Id.* ¶ 39.

On May 29, 2019, Klotz returned for a follow up and was able to meet with Stephenson. *Id.* ¶ 41. Stephenson indicated things were going better and he was feeling more calm and less depressed. The next day, LeClair approved Klotz to continue seeing Stephenson on an as-needed basis. On July 2, 2019, Klotz emailed jail officials to check-in on Stephenson; jail officials informed her Stephenson was "very up and down." Klotz responded by offering to meet with Stephenson if necessary. *Id.* ¶¶ 50–51.

On August 12, 2019, jail officials emailed Klotz and indicated Stephenson had requested to speak to someone. Jail officials also told Klotz that Stephenson was "borderline suicidal." Klotz was unavailable to see Stephenson, so another HHS staff member visited him at the jail. *Id.* ¶¶ 55–58. Klotz received the crisis assessment from that visit which detailed that Stephenson was struggling because he learned his sister had been sexually assaulted by a friend of his, and that Stephenson wished "he was dead" and had "thought about hanging himself." The assessment went on to conclude that Stephenson was "not at imminent risk of harming himself." *Id.* ¶¶ 64–68.

On August 15, 2019, Klotz met with Stephenson again. During this meeting, Stephenson told Klotz that he "would plan to kill himself after his court dates in September" and that he was not eating or drinking water. Stephenson affirmed he was not hearing voices and did not want medication. Klotz' progress notes state, "[Stephenson] denie[d] any suicidal ideation, intent, or plan." *Id.* ¶¶ 69–74; Dkt. No. 138-1 at 9.

On August 20, 2019, Klotz met with Stephenson a final time before his suicide. In this meeting, Stephenson again stated that he would kill himself if he was not released after his September court date. Klotz' progress notes on the meeting state that Stephenson was "less fixated" on committing suicide and was future-oriented, laughing, and joking. Klotz' progress

30

notes state, "[Stephenson] denie[d] any current suicidal ideation, intent, or plan." Dkt. No. 164 ¶¶ 75–81; Dkt. No. 138-1 at 10.

Klotz argues that over the course of her five meetings with Stephenson, she was objectively reasonable in concluding that he was not an imminent risk of suicide. That may be true, but under the Seventh Circuit's most recent articulation of the Fourteenth Amendment standard, the inquiry is broader. *Pittman IV*, 108 F.4th at 570. *Pittman IV*, provides illuminating guidance:

> [The Plaintiff] must prove that the defendants did not take reasonable available measures to abate the risk of serious harm to [the decedent], even though reasonable [therapists] under the circumstances would have understood the high degree of risk involved, making the consequences of the defendants' conduct obvious. That is the essential objective inquiry.

*Id.* at 572. Klotz, and the HHS Defendants more generally, repeat that they only visited Stephenson on a "crisis basis." *See, e.g.*, Dkt. No. 147 at 20. But the county's 30(b)(6) deposition confirms that a more formal, "therapy assessment" under DHS 35.17 was an available option for inmates at Calumet County Jail, and HHS employees had the authority to initiate such a referral. *Id.* at 3–4, 6. A therapy assessment under DHS 35.17 could have resulted in a diagnosis and potentially a referral to the HHS psychiatrist, Dr. Alba. *Id.* Klotz testified that she never pursued, or even offered, more formal services to Stephenson under DHS 35.17. Dkt. No. 158 at 15. Instead, Klotz only saw Stephenson on a "crisis basis" to determine if he was imminently suicidal.

But inmates have a "constitutional 'right to adequate medical treatment,' including mental health treatment and protection from self-harm." *Pittman IV*, at 566 (quoting *Miranda*, 900 F.3d at 350). Mental illness alone—even disconnected from imminent suicide risk—is a serious medical need. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001). The fact that suicide may not have been imminent when Klotz saw him does not mean that Stephenson was not in need of a mental health assessment and treatment.

31

In *Belbachir*, the court held that the decision of a clinical social worker to do nothing after noting that a jail inmate was "suicidal and suffering from a 'major depressive disorder'" was enough to show a constitutional violation even under the deliberate indifference standard. 726 F.3d at 980–81. In rejecting the defendant social worker's argument that because suicide was not imminent, she was not required to act, the court explained:

> The implication is that if Belbachir had said, 'I intend to commit suicide as soon as I formulate a specific plan for how to do so, but not before,' [the social worker] would have replied, 'okay, but tell us when you have devised your plan so that we can prevent your carrying it out,' but that otherwise [the social worker] was entitled to do nothing.

*Id.* The court characterized the argument as "what in another context would be comical." *Id.* If, as *Belbachir* held, the failure to act when suicide is not imminent is enough to show deliberate indifference, it follows that a jury could also conclude that to do nothing simply because Stephenson's suicide is not imminent was not objectively reasonable.

Klotz contends that her only duty was to assess whether Stephenson was imminently suicidal. But that is not true. First, beyond "emergency crisis intervention services," HHS, and therefore Klotz, was responsible for providing "evaluation, diagnostic assessments, psychiatric assessments, medication management, and psychotherapy services when needed." Dkt. No. 149-4 at 1. Second, the standard under the Fourteenth Amendment is objective reasonableness. Brian Holoyda, a forensic psychiatrist retained by Plaintiff, has opined that "no reasonable mental health professional" would have failed to conduct a diagnostic assessment or referred Stephenson to a psychiatrist for "psychiatric assessment, diagnosis, and treatment," and placed him on suicide watch given the information Ms. Klotz had received from the jail and in her various interviews. Dkt. No. 149-6 at 45–46. Dr. Holoyda further opines that the failure to do so led to inadequate assessment, treatment, and planning, as well as Stephenson's suicide. *Id.* Based on the evidence

32

on this record, a jury could find that it was objectively unreasonable to limit the care provided to an inmate such as Stephenson, who was arguably suffering from a severe mental illness, to only those situations where suicide is imminent. A jury could conclude that more was reasonably required and the failure to order a mental health assessment and take additional precautions was a substantial factor in allowing Stephenson to take his own life.

To be sure, there is evidence that Stephenson would not have cooperated in a more thorough evaluation and did not want medication. There is evidence that he refused both treatment options and because he was a minor until early July 2019, it is unclear whether either could have been provided absent parental consent. Moreover, it is not true that Klotz did nothing. She did offer to talk with Stephenson when he needed help and suggested she could teach him coping mechanisms that could help relieve his anxiety and stress in jail. A jury could well conclude this was all that was reasonably required under the circumstances.

It is also arguable that the decision not to recommend placement on suicide watch on August 20, 2021, was reasonable given Stephenson's then state of mind, notwithstanding his acknowledgment of his previously stated plan to take his life sometime in the future in the event things did not go his way in court. Dr. Holoyda has testified otherwise, but a jury need not accept the opinions of an expert witness. *See United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002), *cert. denied*, 538 U.S. 967 (2003) (approving instruction to jury that "the fact an expert has given an opinion does not mean that it is binding upon you"). At this stage of the proceedings, however, it is not the role of the court to resolve such disputes. That is the role of a jury at trial. Summary judgment must therefore be denied as to Klotz.

**b. Shannon Teska**

Shannon Teska was another mental health therapist with HHS. Teska's only interaction with Stephenson was on August 13, 2019, when she responded to a crisis call because Klotz was

unavailable. Based on Teska's progress note of that meeting, she knew that Stephenson was extremely depressed after hearing about his sister being raped, that Stephenson had made comments about hanging himself and stated his depression was going to be the end of him, and that Stephenson was not medicated. Dkt. No. 141-1 at 1. In their meeting, Teska learned that Stephenson "wished he was dead" and had thought about hanging himself. *Id.* at 2. Importantly, he denied being actively suicidal. *Id.* Like Klotz, Teska did not refer Stephenson for an assessment with a psychiatrist. Nor did she recommend that Stephenson be placed on suicide watch. Instead, she arranged for Klotz to meet with Stephenson on August 15, 2019, and made Stephenson aware that he could request to meet with someone sooner if needed. *Id.* at 4.

Plaintiff alleges Teska's alleged failure to appraise herself on Stephenson's medical history prior to seeing him was objectively unreasonable. Had she done so, Plaintiff notes that she would have known of Stephenson's previous suicide attempt, the fact that he had been placed on suicide watch previously and that he claimed he heard demonic voices encouraging him to take his own life. If true, a jury could find from this fact alone that Teska's actions were objectively unreasonable and beyond mere negligence. To ignore readily available information when called upon to assess an inmate's need for mental health treatment and risk of suicide could even amount to deliberate indifference. *Estate of Regan v. Baldwin*, No. 1:17-cv-01059, 2022 WL 20663133, *5 (C.D. Ill. Nov. 21, 2022) ("The jury could infer from the Defendants' lack of access to Patrick's health records pre-incarceration or of knowing what those records contained that the Defendants acted with deliberate indifference by continuing to make evaluations of his suicide risk without a full, accurate picture."). Ultimately, Plaintiff's claim against Teska is essentially the same as its claim against Klotz. Even if Teska concluded that Stephenson was not imminently suicidal, based upon the opinions offered by Dr. Holoyda, a reasonable jury could still find she was objectively

unreasonable for failing to refer Stephenson for an assessment under DHS 35.17 and possible treatment so as to address his serious mental health needs.

The claim against Teska is likewise not defeated by lack of causation. Teska argues that causation is severed by Klotz' subsequent meetings with Stephenson prior to his suicide. While Klotz' meeting with Stephenson on August 15, 2019, would likely sever causation for a claim that Teska's failure to place Stephenson on suicide watch on August 13, 2019, was a cause of his death, it would not prevent a jury from concluding that Teska's failure to refer him for a psychological assessment was causal. In other words, Teska's potential liability is premised on failing to refer Stephenson for formal assessment. As explained above in relation to Klotz, a reasonable jury could find that had Teska initiated the process of formal assessment for Stephenson on August 13, 2019, his underlying mental health would have been addressed and he would not have committed suicide. For these reasons, Teska also is not entitled to summary judgment.

### c. Kristi LeClair

LeClair, the behavioral health division manager for the Calumet County HHS, did not have any direct contact with Stephenson, but she did have knowledge of his circumstances. On May 6, 2019, at the beginning of Stepheson's detention, LeClair knew Stephenson had been placed on suicide watch. Dkt. No. 196 ¶ 50. On May 30, 2019, LeClair met with Klotz and approved Klotz to provide "as-needed" services to Stephenson. Dkt. No. 164 ¶ 43. Further, LeClair dispatched Teska to meet with Stephenson on August 13, 2019. Dkt. No. 196 ¶ 82. LeClair was continuously appraised of Klotz and Teska's interactions with Stephenson via their progress notes. *Id.* ¶ 127. LeClair did not take any action in response to the information she learned.

LeClair, as a supervisor, cannot be held liable under the theory of respondeat superior for alleged unconstitutional acts of her subordinates. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Rather, a supervisor can only be liable through their own individual actions or when they fail to prevent known unconstitutional actions taken by their subordinates. *Id.*; *Whitelaw v. Horton*, Case No. 19-C-0051, 2020 WL 6081709, at *6 (E.D. Wis. Oct. 15, 2020). Because LeClair had knowledge of all the information contained in Klotz and Teska's progress notes, a reasonable jury could also find she was objectively unreasonable in failing to order further precautions, including the initiation of a formal assessment under DHS 35.17, and that failure caused Stephenson's harm.

### 3. ACH Defendants

Plaintiff also alleges Roxanne Morris, a registered nurse, and Dr. Karen Ronquillo failed to treat Stephenson's mental illness in violation of the Fourteenth Amendment. Morris and Dr. Ronquillo both argue their actions were objectively reasonable under the circumstances. The court agrees with the ACH Defendants and will address the claims against them together.

On May 6, 2019, four days after Stephenson was booked into the Calumet County Jail, Morris reviewed Stephenson's intake screening report. The report indicated Stephenson claimed he was depressed, had thoughts of hurting or killing himself, was not taking or prescribed any medication but believed he should be for schizophrenia, had previously been in the hospital for an attempted overdose, and had been diagnosed with panic attacks at ThedaCare. Dkt. No. 194 ¶¶ 3–5. The screening officer also noted that Stephenson was not acting unusual, made no mention of suicide, and his behavior did not suggest mental illness. *Id.* For summary judgment, the court will infer Dr. Ronquillo reviewed the screening report. Dkt. No. 230 ¶ 3. Dr. Ronquillo also reviewed Stephenson's suicide watch log, special watch status initiation, and removal document. Dkt. No. 194 ¶ 79. Plaintiff does not point to any other facts that are relevant to its claim against Morris or Dr. Ronquillo.

36

Plaintiff concedes that neither the facts presented to Morris nor Dr. Ronquillo would have put a reasonable medical professional on notice of Stephenson's immediate suicidality. Dkt. No. 208 at 18. Plaintiff instead argues that Morris and Dr. Ronquillo failed to adequately address an intermediary concern—Stephenson's mental health issues—causing his suicide. This theory ignores the fact that the County's HHS department was responsible for mental health assessment and treatment.

The contract between Calumet County and ACH did not require ACH to provide crisis or general mental health care to jail inmates. That was HSS's role. ACH's contract with the County provided:

> MENTAL HEALTH SERVICES—CRISIS INTERVENTION. ACH will refer inmates to crisis intervention services when indicated. The crisis intervention services will be provided by the FACILITY staff in concert with ACH staff. ACH will coordinate with the medical and programming services (e.g., chemical dependence) at the FACILITY so that patient management is appropriately integrated, health needs are met, and the impact of any of these conditions on each other is adequately addressed. ACH will use an integrated and multidisciplinary team (including FACILITY staff) to develop treatment plans for inmates displaying problematic behavior.

179-12 at 3. This language indicates that ACH was to "refer inmates to crisis intervention services when indicated" and "coordinate" the services its employees provided with others provided at the jail so that patient management was appropriately integrated and patient needs met. Because the jail staff had made referrals for crisis intervention and HHS was responding to those referrals as early as the day after Stephenson arrived at the jail, ACH employees failure to make a referral for crisis intervention upon becoming aware of Stephenson's medical screening was not unreasonable. And because he was not receiving other health services, there was nothing to coordinate.

The Rule 30(b)(6) testimony offered on behalf of both ACH and HHS confirms that HHS was responsible for initiating and performing formal mental health assessment under DHS 35.17.

Melissa Caldwell, PhD, who provided testified as the Rule 30(b)(6) witness for ACH, explained that "[a] person who has not been on medication prior would likely be referred to [HHS] to have an evaluation by a mental health professional who is linked to psychiatric, meaning psychiatrists or medical professionals, for that evaluation." Dkt. No. 199 at 8. Kristi LeClair, the Rule 30(b)(6) witness for HHS, on the other hand, explained that for inmates without an active prescription, an HHS therapist could refer the inmate to the HHS psychiatrist for a complete mental health assessment that could result in a diagnosis and treatment, including medication. Dkt. No. 147 at 5–7. Because formal assessment was outside Morris and Dr. Ronquillo's prescribed duties, and because Morris and Dr. Ronquillo were aware that jail staff had referred Stephenson to HHS and HHS staff were meeting with Stephenson as needed, it was not unreasonable for ACH Defendants to take no action themselves. Plaintiff's claims against Morris and Dr. Ronquillo, therefore, fail as a matter of law.

### B. *Monell* Claims

The doctrine of *respondeat superior* does not apply under Section 1983. *Bd. of the Cnty. Cmm'rs v. Brown*, 520 U.S. 397, 403 (1997). Thus, liability for violations by a municipality's employees is not imputed to the municipality. Instead, municipal liability under § 1983 requires acts or a failure to act that is "attributable to the municipality [that] itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). In this respect, the bar is high and to establish municipal liability under § 1983, a plaintiff must show that an "express policy (e.g., policy statement, regulation, or officially adopted decision), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality" was the direct cause of the alleged constitutional deprivation. *J.K.J v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020) (cleaned up).

"[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017). But where a plaintiff points to inaction or gaps in policy, as opposed to overt municipal action, the road to establishing liability is more demanding. "[T]he path to *Monell* liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *J.K.J*, 960 F.3d at 378. In these situations, *Monell*'s standards of culpability and causation are rigorously "applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (quoting *Brown*, 520 U.S. at 405); *Brown*, 520 U.S. at 407 ("[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989))).

Municipal culpability under a policy gap or failure to train theory gives rise to liability only when a municipality has notice that the failure will cause constitutional violations. *J.K.J.*, 960 F.3d at 379 (citing *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011)). Notice can be shown in two different ways. First, a plaintiff can point to "a prior pattern of similar constitutional violations." *Id.* at 380. Second, a plaintiff can show that a municipality is on notice when the likelihood of a constitutional violation is "so patently obvious" or "highly predictable" such that a pattern of violation is not required. *Id.* at 380–81 (citing *Connick*, 563 U.S. at 64).

This limited path to *Monell* liability for municipal claims may strike one as inconsistent with the "objective reasonableness" standard *Kingsley* adopted for individual-capacity Fourteenth Amendment claims. After all, why should culpable action or non-action on the part of the

government agency that employs the individual actor be required for municipal liability but not for individual liability?  Yet as the Seventh Circuit explained in *J.K.J v. Polk County*,

> teachings from the Supreme Court and our court make plain that *Monell* liability based on a failure to act, at its core, follows from a showing of constitutional violations caused by a municipality's deliberate indifference to the risk of such violations.  Sometimes the notice will come from a pattern of past similar violations; other times it will come from evidence of a risk so obvious that it compels municipal action.  But at all times and in all *Monell* cases based on this theory, the Supreme Court has directed the focus on the presence and proof of "a known or obvious" risk.

*Id*. at 380; *see also Radek v. Parks*, 21-cv-520-jdp, 2023 WL 2163084, at *8 n.4 (W.D. Wis. Feb. 22, 2023) ("Unlike with individual-capacity claims following *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the court of appeals continues to apply a 'deliberate indifference' standard to *Monell* claims by free citizens or pretrial detainees." (citing *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021); *Miranda*, 900 F.3d at 345)).  In the absence of any other guidance from the Seventh Circuit, the court will apply the deliberate indifference standard to Plaintiff's *Monell* claims.

Plaintiff advances three theories of *Monell* liability: (1) Calumet County and ACH had no policy or practice in place that would allow for mentally ill inmates to receive psychiatric assessment or psychotropic medication if they did not enter with a prescription; (2) Calumet County had a practice of ignoring written policy that required guards to communicate with medical staff; and (3) Calumet County failed to properly train its staff.  The court will stop at the first.

Plaintiff's first theory boils down to a "policy gap," but it is more complicated on its face. Plaintiff admits that Calumet County and ACH had policies in place that would allow an inmate to see a therapist for assessment and receive medication—either from an existing prescription or a new one.  Dkt. No. 168 at 23.  Despite these policies, Plaintiff cites to *Woodward v. Correction Medical Services of Illinois* in contending the policies were ignored or misunderstood to the point where there was functionally no policy at all.  368 F.3d 917, 929 (7th Cir. 2004) ("For all intents

40

and purposes, ignoring a policy is the same as having no policy in place in the first place."). Thus, Plaintiff alleges there was a lack of policy or procedure spelling out how an inmate was to be formally assessed for mental health and need for psychotropic medication; and therefore, those treatment options were "walled off." Based on the record before it, the court agrees that a reasonable jury could find a constitutionally violative gap in Calumet County policy existed.

*Monell* liability is premised on municipal fault: that the municipality itself was deliberately indifferent. *Brown*, 520 U.S. at 400 (citing *Monell*, 436 U.S. at 694). Thus, it is not enough for Plaintiff to allege that miscommunication, confusion, or finger-pointing—whatever it may be—resulted in a constitutional deprivation. Rather, Plaintiff must show that municipal action created the policy gap. Or put differently, that "policymakers were deliberately indifferent to a known risk that [a] policy would lead to constitutional violations." *Evans v. Dart*, No. 16 C 6018, 2022 WL 4551951, at *5 (N.D. Ill. Sept. 29, 2022) (quoting *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020)). This is where notice comes in. Notice works to establish municipal fault because it demonstrates the municipality has "knowingly acquiesced in an unconstitutional result." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022).

The County argues that because Stephenson was the first suicide at Calumet County Jail, Plaintiff is required to prove the "narrow exception" where unconstitutional consequences of municipal inaction are "patently obvious." *Id.* at 436 (citing *Connick*, 563 U.S. at 64). But while Stephenson may have been the first suicide in the Calumet County Jail, suicides in jails and prisons across the country are unfortunately not rare. It has long been recognized that "[g]iven the nature of the jail environment, the circumstances that tend to lead to incarceration, and the personal characteristics of persons most likely to be incarcerated, self-harm and suicide are endemic among jail populations." *Maxwell*, 2022 WL 17300881, at *5 (citing E. Ann Carson, Bureau of Justice

41

Statistics, *Suicide in Local Jails and State and Federal Prisons*, 2000–2019 – *Statistical Tables* (Oct. 2021), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf; *Estate of Boncher v. Brown Cnty.*, 272 F.3d 484, 486 (7th Cir. 2001); *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001)). Calumet County was presumably aware of such a risk, even if there had not been a suicide by an inmate in its jail.

Even aside from notice by pattern, the Seventh Circuit has found the possibility of *Monell* liability under a "patently obvious" approach three times. *See Glisson*, 960 F.3d at 382 (holding it was patently obvious that the failure to enact coordinated and comprehensive policies for treating chronically ill inmates would result in constitutional violation; but also considering state of Indiana directives on treatment of chronic illness); *J.K.J*, 960 F.3d 367 (holding it was patently obvious that failure to train on sexual assault prevention in a female prison would result in constitutional violation; but also considering testimony that male guards had previously made sexually suggestive comments about female inmates and evidence the county had knowledge of a prior sexual assault); *see also Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). The Supreme Court has also indicated that it is patently obvious that constitutional violations will occur when a police department provides its officers with firearms but no training on proper use of deadly force. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989).

Calumet County and ACH have policies—at least vague ones—that made it possible for inmates to undergo formal assessment and obtain new psychotropic medications. Calumet County Jail Policy II.07.00.10(D)(2)(e) directs jail officials to contact HHS when an inmate is suffering an emotional crisis severe "enough to warrant the assistance of a mental health professional," while Calumet County Jail Policy II.07.00.20 directs jail officials to refer inmates to HHS for non-emergency treatment. Dkt. No. 179-15 at 4. HHS policy, which is contained in a 3-page

42

document, states, "Calumet County Department of Health and Human Services provides . . . emergency crisis intervention services, evaluations, diagnostic assessments, psychiatric assessments, medication management, and supportive psychotherapy services when needed." Dkt. No. 179-14 at 1. The document provides little guidance for non-emergency referrals, instructing that "[t]he assigned therapist will contact the jail staff that made the referral and will set-up a time and location to meet with the inmate" and "complete a Mental Health Assessment." *Id.* at 1–2. The only indication of ACH policy is language contained in its contract with Calumet County. Paragraph 1.13 of the contract states, "crisis intervention services will be provided by the [County] staff in concert with ACH staff" and "ACH will use an integrated and multidisciplinary team (including [County] staff) to develop treatment plans for inmates displaying problematic behavior." Dkt. No. 179-12 at 3. Paragraph 1.17.3 obligates ACH to provide and pay for all psychotropic medication prescribed by ACH doctors or HHS doctors. *Id.* at 3–4.

The above policies, coupled with Calumet County and ACH's respective 30(b)(6) testimony, indicate that Calumet County, HHS in particular, was responsible for providing psychiatric assessment and prescribing medication. Dkt. No. 147 at 5–7; Dkt. No. 199 at 4, 7–8. For that reason, any policy gap related to those services is attributable to Calumet County, not ACH. Therefore, ACH cannot be liable under Plaintiff's policy gap theory. Plaintiff's *Monell* claim against them will be dismissed.

As to HHS's policy, there is evidence of a significant gap in which this case falls. Even though the policy provides that HHS was responsible for providing "diagnostic assessments, psychiatric assessments, medication management, and supportive psychotherapy services" for inmates at the Calumet County Jail, the policy is devoid of instruction on when and how these services are to be rendered. Thus, by its terms, HHS policy does not preclude the services Plaintiff

43

claims were walled off, "[b]ut it provides no information or instructions about how to invoke those other procedures." *Anderson v. Wis. Mun. Mutual Ins. Co.*, No. 15-C-124, 2016 WL 4471850, at *5 (E.D. Wis. Aug. 4, 2016) (holding that a county's failure to provide information or instructions to jail staff about how to access mental health care for inmate on anything other than emergency basis was sufficient to support *Monell* claim). Further, Calumet County does not point to, nor is there clear support in the summary judgment record, that HHS staff received training on when and how to access mental health care and treatment for inmates who, though not presently suicidal, suffered from serious mental illness. A reasonable jury could even consider the fact that Stephenson was only visited on a crisis basis—despite being assessed by HHS therapists six times over four months—as evidence that a gap existed. Thus, Calumet County's policy is arguably similar to the policies in *J.K.J.* and *Anderson*—a broad, overarching statement that does little in the way of ensuring compliance. A reasonable jury could thus find that a policy gap existed.

That gap, however, must have also put the county on notice that constitutional injury was likely. *See Anderson v. Wis. Mun. Mutual Ins. Co.*, No. 15-C-124, 2016 WL 4471850, at *7. Two considerations weigh in favor of requiring a jury to decide whether it was patently obvious that the gap in policy would likely result in constitutional injury. First, as already discussed, the county had an affirmative duty to care for Stephenson's mental illness. *Sanville*, 266 F.3d at 734; *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Second, this obligation is all the more real in a jail setting where individuals who are already prone to abnormal behavior are placed under considerable psychological strain. *Jutzi-Johnson*, 263 F.3d at 757 ("[J]ail inmates are much more likely to commit suicide than free persons are—in fact, nine times as likely." (citing empirical study)). Echoing *J.K.J.*, it can be said that the jail is a "tinderbox" for mental illness and suicide. Taking these two considerations together, a reasonable jury could

44

conclude it was patently obvious that policy that provided virtually no instruction on providing anything other than emergency crisis services would likely result in constitutional harm.

In sum, a reasonable jury could conclude there was a gap in Calumet County policy. And that gap created a system where Stephenson was only seen on a crisis basis. In the meantime, Stephenson's mental illness was never formally assessed, and his suicidal ideations festered. Had Calumet County policy provided greater direction on initiating and conducting "diagnostic assessments, psychiatric assessments, medication management, and supportive psychotherapy services"—services under DHS 35—Stephenson could have been diagnosed and potentially received medication. As such, a jury could conclude that the gap in Calumet County policy was the moving force and direct cause of Stephenson's suicide. On this theory, Plaintiff has made an adequate showing to sustain a *Monell* claim against Calumet County. The county's motion for summary judgment will be denied.

## CONCLUSION

Stephenson's death is tragic. But the path to constitutional liability is often a difficult one to travel. Thus, for the reasons stated, the court will dismiss many of Plaintiff's claims. A narrow set—individual claims against Klotz, Teska, and LeClair, as well as a *Monell* claim against Calumet County—will survive to be heard by a jury. Because individual claims against county employees will survive, Plaintiff's state law indemnification claim under Wis. Stat. § 895.46 will also survive.

**IT IS THEREFORE ORDERED** that Dr. Karen Ronquillo's motion for summary judgment (Dkt. No. 139) is **granted** and Plaintiff's claim against her is dismissed.

45

**IT IS FURTHER ORDERED** that Advanced Correctional Healthcare Inc., Roxanne Morris, and USA Medical and Psychological Staffing SC's motion for summary judgment (Dkt. No. 174) is **granted** and Plaintiff's claims against them are dismissed.

**IT IS FURTHER ORDERED** that Kristen Klotz, Krisi LeClair, and Shannon Teska's motion for summary judgment (Dkt. No. 135) is **denied**.

**IT IS FURTHER ORDERED** that Brett J. Bowe, Calumet County, Julie Hoerning, Kurt Kohler, and Elizabeth Zahrobsky's motion for summary judgment is **granted-in-part and denied-in-part**. The motion is **granted** as to the individual claims against Bowe, Hoerning, Kohler, and Zahrobsky and Plaintiff's claims against them are dismissed. Summary judgment is **denied** with respect to Plaintiff's *Monell* claim against Calumet County.

**IT IS FURTHER ORDERED** that Plaintiff's motion for partial summary judgment (Dkt. No. 162) is **denied**.

The court will schedule a status conference with the remaining parties to set a date for trial.

Dated at Green Bay, Wisconsin this 19th day of November, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge